Durfee, Judge,
delivered the opinion of the court:
This is an action for delay damages growing out of defendant’s alleged breach of contract. The contract in question was entered into November 18, 1954. Under the contract, plaintiff undertook to complete additional airfield paving and other work at the Walker Air Force Base, Eos-well, New Mexico. The total consideration was $2,072,739.61.
Under the contract, plaintiff was to commence work within ten days of receipt of the contract; to complete the work not later than 300 calendar days from the commencement date; and to “complete work within landing areas” as expeditiously as practicable. The work involved was characterized as “critical” at a prebidding conference.
Plaintiff commenced work in December of 1954 and did complete performance within the requisite 300 days. Plaintiff now claims that but for “failure of defendant’s employees to give plaintiff a reasonable measure of cooperation in the performance of essential inspections and tests,” plus the “deliberate harassment and dilatory tactics” of defendant’s employees and “the absence of adequate supervision by the *422 contracting officer,” plaintiff could have and would have completed the work some 94 days earlier.
Plaintiff contends that the action of defendant’s employees constituted a breach of contract in that defendant was under an obligation not to hinder plaintiff’s performance generally, and was specifically bound to conduct the requisite tests “in such a manner as not unnecessarily to delay the work” as provided in section 9 (b) of the contract. Plaintiff further contends that due to this alleged breach, it has suffered damages in the amount of $500,408.45.
In order to recover, plaintiff must surmount three hurdles. First, it must prove that defendant’s employees did unnecessarily cause delay. It must then establish that such delays constituted a breach of contract. Finally, it must establish that it suffered damages due to the breach.
That the last shall come first here seems advisable since, if plaintiff suffered no damages, it cannot recover even assuming a breach. Accordingly, we will first address ourselves to the question whether as a matter of law a plaintiff can recover damages when delay has not prevented completion of the contract within the specified time.
On this point, plaintiff has cited no authority directly in point. In Carroll v. United States, 76 Ct. Cl. 108 (1983), defendant delayed claimant’s completion some 637 days beyond the 120 day completion date. Great Lakes Const. Co. v. United States, 96 Ct. Cl. 378 (1942) involved a suit for damages growing out of defendant’s delays which retarded completion of the contract from November 26, 1933 to June 7, 1934. Walter A. Rogers v. United States, 99 Ct. Cl. 393 (1943) and George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 69 F. Supp. 409 (1947) involved similar situations. None reach the issue of whether, as a matter of law, damages are suffered through delays which do not prevent a timely completion of the contract.
Defendant, on the other hand, seems to rely on United States v. Blair, 321 U.S. 730 (1944) for the proposition that since there is no obligation or duty on the part of defendant to aid a contractor towards early completion, “plaintiff cannot impose liability on defendant for delay in not letting *423 [plaintiff?] complete the contract before that (the completion) date * * *” (Def. brief p. 14).
But a close reading of Blair, supra, does not support defendant’s position. While it is true that there is not an “obligation” or “duty” of defendant to aid a contractor to complete prior to completion date, from this it does not follow that defendant may hinder and prevent a contractor’s early completion without incurring liability. It would seem to make little difference whether or not the parties contemplated an early completion, or even whether or not the contractor contemplated an early completion. Where defendant is guilty of “deliberate harassment and dilatory tactics” and a contractor suffers damages as a result of such action, we think that defendant is liable.
We now turn to plaintiff’s contention that defendant, through the deliberate harassment and dilatory tactics of its employees, did in fact cause plaintiff a delay of some 94 days. The burden of proving that the alleged delay was caused by defendant, and did encompass the alleged 94 days, is of course upon plaintiff. We do not believe that plaintiff has adequately discharged that burden, under the findings by the Trial Commissioner.
Plaintiff has here excepted to virtually all of the Commissioner’s findings. Though its exceptions and proposed findings are too numerous to mention here in detail, suffice it to say that upon careful search of the record, we could find no evidence sufficient to support plaintiff’s exceptions and proposed changes.
Though plaintiff was delayed due to the default of another contractor, — Groseclose, due to the failure of its own subcontractor to provide sufficient truckage, and due to inclement weather, it is well established that no recovery for these delays can be had from defendant.
The crux of plaintiff’s claim is that personal animosity between an agent of defendant and an employee of plaintiff “infected” defendant’s testing personnel causing them to harass plaintiff through “insignificant” delays which, in the aggregate, plaintiff contends, constituted a breach of contract. We can find no delay due to defendant’s testing personnel.
*424 Plaintiff attempted to show deliberate harassment through its allegation of personal animosity. But not only has plaintiff failed to prove that animosity did exist; it has also failed to prove that the alleged delays flowed from that animosity.
Accordingly, and upon the Commissioner’s findings of fact which are hereby adopted as the findings of the court, we find that as a matter of law plaintiff is not entitled to recover damages, and its petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. On November 18, 1954, the plaintiff, an Oklahoma corporation, and the defendant, acting through the Department of the Army, Corps of Engineers, entered into a contract (hereinafter called Contract 1412), numbered DA-29-005 eng-1412, for additional airfield pavements and lighting at Walker Air Force Base, Boswell, New Mexico, for a total consideration of $2,072,739.61, based upon unit prices for various classes of the work. Col. Lynn C. Barnes, District Engineer of the Albuquerque, New Mexico, District Office, was contracting officer for the defendant. Under the contract, work was to start within 10 calendar days after date of receipt of notice to proceed, and was to be completed not later than 300 calendar days after date of receipt of notice to proceed.
2. Notice to proceed was sent to the plaintiff by letter dated December 3, 1954, which was received by the plaintiff on December 6,1954.
3. The plaintiff was an experienced contractor, having performed much work in paving at airports, and on streets and highways for various governmental authorities. Prior to the performance of the work under the contract in suit, it had recently concluded a 3 million dollar asphalt paving contract at the Altus (Oklahoma) Air Force Base for the defendant.
4. All of the contract work was completed by January 10, 1956. By November 2, 1955, practically all of the paving *425 work had been finished and there remained only a small amount of electrical work which had been delayed due to nondelivery of cable.
5. Pertinent provisions of the contract are quoted below:
8. Changes
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: Provided^ however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
*****
5. TERMINATION EOR DEFAULT-DAMAGES FOR DELAY— TIME EXTENSIONS
(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby, and for liquidated damages for delay, as fixed in the specifications or accompanying papers, until such reasonable time as may be required for the final completion of the work, or if liquidated damages are not so fixed, any *426 actual damages occasioned by such delay. If the Contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor.
(b) If the Government does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the work, in which event he and his sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay.
(c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to causes other than normal weather beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors or suppliers due to such causes: Provided, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officer shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof.
6. disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail, or otherwise furnish, a copy thereof to the Contractor at his address shown herein. Such decision shall be final and conclusive unless, within 30 days from the receipt thereof, the Con *427 tractor appeals in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the Contractor, he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this article. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. Pending final decision of a dispute hereunder the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
* * * * *
8. MATERIALS AND WORKMANSHIP
Unless otherwise specifically provided for in the specifications, all equipment, materials, and articles incorporated in the work covered by this contract are to be new and of the most suitable grade of their respective kinds for the purpose and all workmanship shall be first class. Where equipment, materials, or articles are referred to in the specifications as “equal to” any particular standard, the Contracting Officer shall decide the question of equality. The Contractor shall furnish to the Contracting Officer for his approval the name of the manufacturer of machinery, mechanical and other equipment which he contemplates incorporating in the work, together with their performance capacities and other pertinent information. When required by the specifications, or when called for by the Contracting Officer, the Contractor shall furnish the Contracting Officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed. Machinery, equipment, materials, and articles installed or used without such approval sba.n be *428 at the risk of subsequent rejection. The Contracting Officer may in writing require the Contractor to remove from the work such employee as the Contracting Officer deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued employment on the work is deemed by the Contracting Officer to be contrary to the public interest.
9. INSPECTION
(a) Except as otherwise provided in paragraph (d) hereof all material and workmanship, if not otherwise designated by the specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Eejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the Contractor shall promptly segregate and remove the rejected material from the premises. If the Contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the costs thereof to the Contractor, or may terminate the right of the Contractor to proceed as provided in Clause 5 of this contract, the Contractor and surety being liable for any damage to the same extent as provided in said Clause 5 for terminations thereunder.
(b) The Contractor shall furnish promptly without additional charge, all reasonable facilities, labor, and materials necessary for the safe and convenient inspection and test that may be required by the Contracting Officer. All inspection and tests by the Government shall be performed m such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be as described in the specifications. The Contractor shall be charged with any additional cost of inspection when material and workmanship are not ready at the time inspection is requested by the Contractor.
(c) Should it be considered necessary or advisable by the Government at any time before final acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the Contractor shall on request promptly furnish all necessary facilities, labor, and material. If such work *429 is found to be defective or nonconforming in any material respect, due to fault of the Contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. If, however, such work is found to meet the requirements of the contract, the actual direct cost of labor and material necessarily involved in the examination and. replacement, plus 15 percent, shall be allowed the Contractor and he shall, in addition, if completion of the work has been delayed thereby, be granted a suitable extension of time on account of the additional work involved.
(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site. Nothing contained in this paragraph (d) shall in any way restrict the Government’s rights under any warranty or guarantee.
6. Pertinent provisions of the contract specifications are quoted below:
GC-3. site investigation and representations : The contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling, and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other matters upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract. The contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably *430 ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that the responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the contractor.
# % # * $
GC-5. PROGRESS CHARTS, AND REQUIREMENTS FOR OVERTIME WORK:
a. The contractor shall within five days or within such time as determined by the Contracting Officer, after date of commencement of work, prepare and submit to the Contracting Officer for approval a practicable schedule, showing the order in which the contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant, and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer, and shall immediately deliver to the Contracting Officer three copies thereof.
b. The contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the contractor falls behind the progress schedule, the contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to increase the number of shifts, and/or *431 overtime operations, days of work, and/or the amount of construction plant, all without additional cost to the Government.
c. Failure of the contractor to comply with the requirements of the Contracting Officer under the provision shall be grounds for determination by the Contracting Officer that the contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such determination the Contracting Officer may terminate the contractor’s right to proceed with the work, or any separable part thereof, in accordance with the delays-damages article of the contract.
* * * * #
GC-7. quality op articles, materials, and equipment:
a. Articles, materials, and equipment to be incorporated into the work under the contract shall be new and unused unless otherwise specified and, where required, will conform to the requirements of Government specifications or standards, and to the amendments thereto, in effect on the date of issue of the invitation for bids.
b. Any samples and descriptive data required shall:
(1) Be submitted within the time specified in these specifications or, if no time be specified, within a reasonable time before use to permit inspection and testing.
(2) Be shipped prepaid and delivered as specified in these specifications, or as directed by the Contracting Officer.
(3) Be properly marked to show the name of the material, trade name of manufacturer, place of origin, name and location of the project where the material represented by the sample is to be used, and the name of the contractor submitting the sample.
c. Samples not subjected to destructive tests may be retained until completion of the work but thereafter will be returned to the contractor, if he so requests in writing, at his own expense. Failure of any sample to pass the specified requirements will be sufficient cause for refusal to consider further any samples from the same manufacturer whose materials failed to pass the tests.
# * * ❖ *
GC-18. inspection: The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors *432 to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence of or absence of an inspector relieve the contractor from any requirements of the contract. As soon as practicable after the completion of the entire work, or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted; and final payment therefor will be made in accordance with the article of the contract entitled “Payments to Contractors.”
* tfc % * ^
SC-2, liquidated damages : In case of failure on the part of the contractor to complete the work within the time fixed in the contract, or any extensions thereof, the contractor shall pay the Government as liquidated damages, the sum of $400.00 per calendar day of delay until the work is completed or accepted.
❖ * ❖ * #
SC-8, layout of work : The contractor shall lay out his work from the Government-established ranges and gages indicated on the drawings and shall be responsible for all measurements in connection therewith. The contractor shall furnish, at his own expense, all stakes, templates, platforms, equipment, range markers, and labor as may be required m laying out any part of the work from the ranges and gages established by the Government. _ The contractor will be held responsible for the execution of the work to such lines and grades as may be established or indicated by the Contracting Officer. It shall be the responsibility of the contractor to maintain and preserve all stakes and other marks established by the Contracting Officer until authorized to remove them. If such marks are destroyed by the contractor or through his negligence prior to their authorized removal they may be replaced by the Contracting Officer at his discretion. The expense of replacement will be deducted from any amounts due, or to become due, the contractor.
*❖❖:*:*
SC-12. EMERGENCY LIGHTING AND SIGNALS REQUIRED OP AIRFIELD CONSTRUCTION AND ELIMINATION OP HAZARDS:
The operation of all ground equipment, mobile or stationary, required for construction, repairs, or any other *433 purpose within the landing areas of all airdromes shall be governed by the following regulations:
Definition: The term “Landing areas” shall include all runways and taxiways plus 75 feet on each side and a zone 1,000 feet long at each end of each runway, or to within 50 feet of the boundary of the airport. On allover landing fields, the entire area available for landing and taxiing of aircraft is included in this term.
a. Landing areas hazardous to aircraft shall be outlined by yellow flags by day and red lanterns by night, except that where contact lights outline the runway, no red lanterns shall be placed on obstructions outside the contact light areas.
b. All equipment and materials in the landing area shall be marked with yellow flags by day and red lanterns by night, except that where contact lights outline the runway, no red lanterns shall be placed on obstructions outside the contact light area.
c. Nothing shall be placed upon a landing area without authority of the Contracting Officer.
d. Neither equipment nor personnel shall use any runway for any purpose other than aircraft unless the runway is closed by order of the Contracting Officer and marked as indicated above.
(1) The Contractor shall report to the Contracting Officer before initiating any work and shall notify the Contracting Officer of proposed changes of locations of operations. At all airdromes where flying is controlled, additional permission must, in each and every instance, be obtained from the control tower operator before entering a landing area unless such area is marked as hazardous to aircraft as indicated in a. above.
(2) Work will be carried on in such a manner as to leave the portion of the landing area which is available to aircraft free from hazards at all times. There shall be no ruts, holes, material piles, or projecting shoulders which might damage an airplane tire. Paved surfaces such as runways, taxiways, and hardstands shall be kept clean at all times and specifically must be kept free from all small stones which might damage propellers. No separate payment will be made for this lighting and protection; all costs in connection therewith shall be included in the cost of the work.
(3) The Contractor shall exercise the utmost effort to complete work within landing areas as expeditiously as practicable. Toward that end, trenches for cables and ducts, and excavations for structures, lighting, drain *434 age and other utilities shall not be commenced until all required materials and equipment are on hand and ready for installation. Upon completion of the installations of materials and equipment, backfilling shall be completed as rapidly as practicable, and any surplus materials, equipment and excavation shall be entirely removed from the landing areas.
7. On November 4, 19'54, there had been a prebidding conference attended by about 60 persons, including the contracting officer and two of the plaintiff’s key personnel, E. S. Kavanaugh, vice president, and Stoner K. McLelland, general superintendent. Others in attendance represented the Corps of Engineers, the Air Force, and other potential contractors.
The contracting officer began the conference by stating that time was of the essence on the work; that 300 days would be allowed to accomplish the job; and that properly equipped and organized, the work could be accomplished by that time. The question was raised by one of the potential bidders as to possible interference which might be encountered with work already under way at the base by another contractor. Mr. Wabashaw, the project engineer at Walker Air Force Base, answered the question in these words:
mr. stillman :I would like Mr. Wabashaw’s opinion of how the contract presently under way is going to affect us in our phasing.
mr. wabashaw : What interference there will be from the present contract? (Yes).
I don’t think there is going to be any interference. Their work is at such a place you can get in and work beside them without any interference. By the time this job is under way, he is going to be a lot farther along. As I see it now, there would be practically no interference if you moved in tomorrow.
The contracting officer stated in part as follows:
Another thing: After the job is awarded, you are required to submit your construction program schedule— how you propose to do the job. That is very vital and a very important thing to us, because your construction schedule which you propose to follow is the basis on which the Air Forces at local level and all through the commands to the top-side follow the progress of these jobs. It is the basis on which they phase certain usages, *435 and it is very important. Don’t just plot a curve and say, “I start here and stop here.” Each month a report goes to Washington that shows exactly where you should be on the curve, and people come to the field to check your progress with that curve. It is very important, and, as you think out your job, think about that curve which you will submit.
8. The plaintiff sues to recover on account of claimed delays which it says were caused by the defendant in the performance of the contract work, particularly in the testing of materials and inspection of finished work.
The plaintiff claims that it could have completed the paving 94 days earlier than it did but for the delays in testing materials, and also in the inspection of finished work.
During the performance of the work, no written complaint as to delay was made by the plaintiff.
During the performance of the work, there was no instance where the “disputes clause” of the contract was invoked.
After the completion of the contract work, the plaintiff complained of the nature of the supervision of the work, while the work was in progress, which had been exercised on behalf of the contracting officer.
9. The major construction items undertaken by plaintiff at Walker Air Force Base under Contract 1412 were:
A. Widening by 100 feet, on the southeastern side, the entire length (13,000 feet) of the principal NE-SW runway.
B. Repair and overlay with asphaltic concrete the existing RE-SW runway.
C. Construction of various taxiways.
D. Construction of parking apron and pavement with tar-rubber surface.
10. The work was to be accomplished and was performed in such a manner that permitted Air Force operations to continue at the Base. As to the 13,000-foot runway, it was always available for plaintiff’s work since it was not in use by Air Force planes, but the work on other portions had to be and was timed to minimize the interference between Air Force operations and construction work.
11. The plaintiff, in early December 1954, began to move men and equipment to the job site, and the plaintiff began performance under the contract in suit.
*436 12. At this time, work was proceeding under another separate contract between the defendant and the Myron Groseclose Company, which involved paving at the Walker Air Force Base on 2 taxiways, and also on the northeast end of the main 13,000-foot runway. This contract will be referred to as No. 1251.
13. On January 19, 1955, the Groseclose contract was declared in default and the bonding company under that contract undertook to complete the work through the Northwestern Engineering Company as general contractor. On January 26, 1955, the plaintiff entered into a subcontract with the Northwestern Engineering Company, pursuant to which the plaintiff agreed to perform work on Contract 1251, at an estimated cost of $240,000, by March 17, 1955. The work under this contract was performed by the plaintiff while it was in its initial stages of performance under the contract in suit, which will sometimes hereinafter be referred to as Contract 1412. The plaintiff’s work under Contract 1251 was completed by about May 5, 1955. It was paid a total of $290,000 for the work it performed on this contract.
14. Although the plaintiff contends that it took over the additional work under Contract 1251 in order to “protect its interest,” it has not been demonstrated that plaintiff’s work could not have proceeded, in large measure, independently of the work under that contract. There was, however, some degree of overlap between the two contracts, and plaintiff was delayed to some degree by Groseclose’s default on contract 1251, and the consequent fact that that contract was not “a lot farther along.”
15. It has not been established in the record how many of the plaintiff’s employees who may have begun work on Contract 1412 were later assigned to work on Contract 1251; nor has it been shown what numbers of the plaintiff’s employees worked on each contract. In some instances, as in the operation of the asphalt mixing and laying equipment, there was an alternating use of men and equipment between the two contracts. This was certainly true as to plaintiff’s supervision.
16. The plaintiff purchased all of the equipment which had been used on the Groseclose work, but it is not clear in *437 the evidence as to the extent of such equipment except a Barber Greene asphalt plant.
17. On December 15,1954, the plaintiff submitted its proposed progress chart to the authorized representative of the defendant’s contracting officer. On January 31, 1955, written approval of the proposed progress chart was sent to the plaintiff.
18. On January 31, 1955, T. B. Tillman, the contracting officer’s representative, sent the following letter to the plaintiff:
It has come to the attention of the undersigned that your construction progress on the subject contract is below your scheduled rate of progress as shown by your progress chart which was submitted by letter dated 15 December 1954. Special emphasis is placed on the work covered by items (6), (5, 7 & 10), (8, 9, & 11), (12, 13 & 15) and indicated by bar graphs on your progress chart to be starting during the month of January 1955.
Your attention is called to Paragraph GC-5 of the subject contract specifications which states in part that the Contractor shall furnish sufficient forces and/or the amount of construction plant required and shall work such hours including night shifts and overtime operations as may be necessary to insure prosecution of the work in accordance with the Contractor’s progress schedule.
In as much as your present rate of progress will not insure completion of your contract by the scheduled contract completion date 2 October 1955, you are directed in accordance with the above paragraph to take the necessary steps including furnishing additional forces and/or additional construction plant to insure completion of your contract by the scheduled completion date.
You are also directed to advise this office by letter not later than 7 February 1955 as to what steps you propose to take in order to get the subject contract back on the scheduled rate of progress.
19. On February 5,1955, the plaintiff replied to the above-quoted letter, as follows:
Re: Progress — Contract No. DA-29-005-eng-1412 Dear Mr. Tillman:
Replying to your letter of January 31, 1955, as references above.
*438 Wish to advise that material for item 6 is now_ at Dallas for approval. We have our asphalt material, prime and tack materials ordered, and on the bituminous materials received, copies have been submitted to the paving Engineer.
Also, we wish to point out a part of the progress not being considered. We have expended approximately $10,000.00 for engineering, $12,000.00 bond, $25,000.00 moving in, and $10,000.00 project overhead. These of course are all necessary costs in connection with construction of the job, and as such are all part of our contract price.
While the setting up of materials to meet specifications, and other phases of getting the project under way has taken time, we plan to use sufficient forces, and/or the amount of construction equipment necessary, including night shifts and overtime as required to complete the work on schedule.
20. On February 8, 1955, the contracting officer and representatives of the plaintiff had a discussion at Roswell concerning the plaintiff’s progress in its performance of the contract work. Thereafter, because the work was behind schedule, the contracting officer, on February 28, 1955, sent a further letter to the plaintiff on the subject of unsatisfactory progress, which reads as follows:
Reference is made to our discussions of your progress on this contract at Roswell, New Mexico on 8 February 1955. Since that time I have continued to observe your progress very closely, and I find that the work completed to date is considerably less than required and far below that which you indicated would be done.
In analyzing your progress it appears that practically every item of work shown on your progress schedule is behind the required amount. The most serious aspect of the situation is your apparent inability to produce or obtain base course and hot-mix pavement aggregates and the lack of sufficient equipment for compaction. The base course and hot-mix operations which have been carried on to date have utilized aggregates borrowed from stockpiles for Mr. Groseclose’s contract which are now nearly depleted. Within about one (1) week these very important items of work will stop until you can produce or obtain more aggregate. A record of the completed subgrade shows that the rate of compaction is far below what will be required to complete the com *439 paction of subgrade and base materials on time. Additional compaction equipment will be required.
In order for this job to regain the progress which is now being lost and to complete on time, very definite action on your part is necessary. I would appreciate it very much if you would forward to me, by 8 March 1955, your plans for correcting the situation. I would like to receive from you a copy of your Progress Chart marked up to show your estimated percent of completion of each bar shown on it, plus your detailed plans for placing each of the delayed items back on schedule.
I would like to impress you again with the fact that the runway facilities at Walker Air Force Base are very critical items. Delay in completion for inexcusable reason will not be permitted. Prompt and sufficient corrective action at this time when it will be effective, will eliminate the necessity for further action, as provided for by paragraphs GC-5b and GC-5c of the specifications.
21. On March 8, 1955, the plaintiff replied to the above letter as follows:
The following information is given in response to your letter of February 28, 1955, calling for an answer by March 8, 1955.
We are enclosing a copy of our progress chart which we have marked up to and including March 5, 1955. Comparing this chart we find that we are $120,000 behind schedule. Of this amount we have expended approximately $40,000 that should rightly be charged at the beginning of the progress chart and would decrease the amount that we are behind schedule. This $40,000, which constitutes such items as $12,000 for bonds, $21,000 for moving of equipment and plant setup; temporary facilities and other advance costs. This correction to the chart would not put us back on schedule but we feel that they are items that should be considered in judging our progress.
We believe we have corrected the most serious aspect of our situation, that is, the production of aggregates for the aggregate base and hot mix material and, at the present time, have two crushing plants operating to produce these aggregates. The Youngman plant has started working 16 hours per day, the first of this week, and has produced 14,000 tons of material to be used in the surface hot mix courses. As of today we switched them to stabilized base course material, and on Thursday they will be back on production of binder asphalt material. *440 He has been producing surface material at the rate of 1.000 tons per 8-hour shift, and we feel sure he will be able to up this when he gets to the stabilized aggregate base course material and the binder asphalt material. During the last few days we have had the Mullinix Aggregate Company producing stabilized aggregate base material for us and are currently switching over to binder asphalt material in order to replenish the stockpiles that were borrowed from the Groseclose plant. His rate of production is not as high as the Youngman plant. However, he can produce stabilized aggregate material at the rate of 1,300 tons per 12-hour shift and, from his past performance, he can produce 700 tons of hot mix binder material and about 500 tons of hot mix surface material. With these two plants producing crushed aggregates, we see no reason why they cannot produce between 2,500 and 3,000 tons of aggregate per day. This rate of production should be more than ample to allow us to complete the j ob on schedule.
In order to increase the rate of compaction on our project we have moved four sets of double, heavy-duty sheepsfoot rollers and tractors to pull the sheepsfoot on to our runway job. These units nave been used on the Groseclose project but have completed their work on that project and have been released to our contract. Within a few days we will have an additional 50-ton pneumatic roller to add to the complement of compaction units working on our runway job. This would give us two heavy pneumatic rollers for that work. We feel that this will meet your requirements for additional compaction equipment.
By the last of this month, we should have two hot mix asphaltic Concrete plants producing material full time for our runway j ob. A ow that warmer weather is setting in we feel that the output of these plants should exceed 2.000 tons of Asphaltic Concrete per day, even on one shift. We feel that such a capacity will be adequate to complete the Asphaltic Concrete requirements of this job within the specified time. This would mean that we would have to average 650 tons per calendar day to complete our work on schedule. This figure is well within our rates of production from other airbase projects.
During our conference on February 8th in Mr. Tillman’s office, Mr. Wabashaw requested additional laboratory personnel and apparently it was agreed that this request was justified. Also, additional equipment was requested to aid in the speedup of testing. Although *441 our help was not requested, we have set up a completely equipped laboratory at our asphalt plant and have had the services of a commercial testing laboratory man for the past month to assist in running all the tests that are required to get such a job started. Again, at no request from any of yoUr personnel, we have furnished two men to help dig out the densities required in that We felt that this would help speed up this procedure. We have supplied the project with a Gilson shaker screen to help process the gradation tests, and are furnishing a moisture machine that should cut down the time required for an answer on density tests from sis hours to thirty minutes. It is our policy to have a laboratory of our own on a job of this nature and we are always willing to employ any personnel or supplies and equipment that will help move the job along. As you are no doubt aware, the laboratory that was built and used for a while on the Groseclose project has been closed and all of the testing is being handled out of the laboratory building that the Metropolitan Paving Company supplied for their contract. We feel that the laboratory technicians you have on the job are quite well qualified and are doing a good job, as far as their time permits. But we feel, as was mentioned by your personnel in the February 8th meeting, that additional technicians and equipment would assist us greatly in speeding up operations.
22. On March 9, 1955, the plaintiff’s general superintendent, Mr. Stoner McLelland, and its vice president, Mr. E. S. Kavanaugh, met with the contracting officer at the District Office of the Corps of Engineers at Albuquerque. At this conference, the letter quoted in the preceding finding was handed to the contracting officer. Matters of job progress and its improvement were discussed. The plaintiff’s representatives told Colonel Barnes, the contracting officer, that it had been delayed in part because the Corps did not have sufficient testing personnel on the job and that the Corps’ laboratory needed an additional piece of equipment for the plasticity tests, called a moisture reset machine. The contracting officer arranged for the plaintiff’s representatives to meet with the area engineer and his staff at Walker Air Force Base the next day and such a meeting followed.
The Corps representatives at the latter meeting pointed out that there were two main causes for the plaintiff’s failure to *442 keep up with scheduled production, namely, lack of sufficient compaction equipment such as sheepsfoot and heavy rolling equipment, and also the failure of the plaintiff to deliver sufficient base materials to the work areas. It was the position of the Corps representatives that the pits from which the materials were being taken were not being operated efficiently. The plaintiff’s representatives countered with the charge that the defendant did not have enough testing personnel assigned to the work. They were advised that with the plaintiff’s then rate of progress, no additional testing personnel would be needed but that if production increased, the defendant would then consider whether or not to augment its laboratory force.
23. On March 14, 1955, the plaintiff requested a 49-day delay time extension for contract completion by letter of that date.
24. By letter of March 21, 1955, the plaintiff made an explanation to the defendant’s area engineer of what it thought was the cause of its unsatisfactory progress, as well as its means of obviating such difficulties in the future. The letter stated, in part, as follows:
In reply to your letter of 15 March 1955, subject above, we wish to inform you of the progress we have made in the way of corrective measures. The maj or deterrent has been our material for Item Humber 6 (Select Material Base Course). We submitted samples in advance of the work as required by the specifications, and it was determined that an admix would be necessary to correct certain deficiencies of the material. This admix was blended with the pit run material in accordance with the theoretical needs of the base, but as the removal of material from the pit progressed, the deficiencies recognized heretofore changed and enlarged, requiring more, and perhaps, different admixtures. The exact amounts of supplementary material needed under these varying conditions could be determined only by laboratory tests by the Corps of Engineers. As a result, the Select Material Base Course would often be laid before we were aware that it did not meet specifications. Thus we had to tear the defective base up, blend in additional material, and relay the improved select material; a costly and time consuming process. This held up the work on subgrade preparation, Item number 2, because of our hesitancy to *443 open up an excessive area of work, thus exposing it to the possible inclemency of weather. Obviously the succeeding stages of the construction were held up, due to the necessity of prior completion of the Select Material Base Course.
We have now obtained a new source of Material for the Select Material Base Course. Samples have been submitted to your laboratory in the usual fashion. Our source of this new material is the Youngman pit, west of the base. Material for aggregate base and some of the asphaltic concrete aggregates are also being produced from this same source. We anticipate no difficulty in keeping this material within the required limitations, and expect to progress rapidly towards our scheduled completions of the items “a” to “d” inclusive as noted in your letter of 15 March 1955.
*****
The joint densities in the asphaltic concrete have been of great concern to us as well as to the Corps of Engineers. As you mentioned, several discussions have been held, at which times theories to correct the situation were advanced by both interested parties. All the practical ideas brought forth from these discussions have been subsequently field tested without apparent improvement, else there would be no need for mention of it in this correspondence. The factor lacking in this dilemma remains to be discovered. We are open to suggestions and are always willing to cooperate wholeheartedly in any sort of improvement in construction methods pertaining to asphaltic concrete.
We have taken action to alleviate our aggregate material difficulties by placing an additional crew at the pit and at the crusher. These operations are now running two shifts per day.
Another delay which reflects adversely on our progress chart is the time lost for construction purposes due to conditions over which we have no control. We have requests pending for time extensions by your office in the aggregate amount of 46 days, not including that request that was applicable only to Phase I, Area A. This time potential cannot be shown on our chart until it is approved, but neither can it be ignored when considering the apparent shortcomings of the progress in question.
In view of the above actions and others contemplated, we sincerely expect to be on schedule as indicated on our Progress Chart by 15 April 1955.
*444 25. At the end of March 1955, plaintiff’s hauling subcontractor slowed production by failing to furnish enough trucks.
26. On April 19, 1955, the contracting officer again complained, in writing, to the plaintiff, listing various items of contract work as the plaintiff had indicated on its approved progress chart and comparing the actual with scheduled progress, and concluding as follows:

Item Scheduled Actual

a. Subgrade preparation, Items 2, 3 and 4------ 57% 23%
b. Select material base course, Item 6--------- 53% 37%
c. Prime and tack coat, Items 8, 9 and 11------ 39% 8%
d. Asphalt Paving, Items 12, 13 and 15-------- 43% 39%
e. Concrete Paving, Items 17 and 18---------- 80% 25%
f. Drop outlets, etc., Items 22, 35, 57, 58 and 58(a)___________________________________ 79% 25%
g. Utilities, Items 45, 46 and 48---------------- 72% 40%
h. Duct and electrical manholes, Items 59, 81, 89 and 98_______________________________ 49% 31%
Paragraph GC-5 of the contract specifications outlines the action the contractor is obligated to initiate if he falls behind the approved progress schedule. It is directed that you inform this office in writing by 25 April 1955 of the action you intend to take and the date you again estimate the actual progress will be returned to schedule as depicted on the progress schedule approved by this office.
27. The plaintiff had arranged a conference through a member of Congress between its president, Mr. A. J. Kava-naugh, and two colonels from the Washington, D.C. office of the Corps of Engineers. The conference was held on April 15, 1955, in the Congressman’s office and Kavanaugh complained to the colonels that his firm was not being given proper consideration by the Corps of Engineers personnel at the site of the work. The details as to what transpired at the conference are glossed over in the testimony but it resulted in a further conference between A. J. Kavanaugh and the contracting officer on April 25th.
The contracting officer came to Oklahoma City and met with A. J. Kavanaugh, who told him that the plaintiff felt its work was up to schedule and the problems were all caused by the contracting officer’s representatives and staff at the site of the work. He said that the matter had to be straightened out because “* * * it was costing us [plaintiff] *445 a lot of money, * * He said lie wanted it “straightened out” or he would have to make a “formal complaint” about it. Colonel Barnes, the contracting officer, said he would talk to his people and that Kavanaugh should talk to the plaintiff’s personnel. Since Barnes was about to take a vacation, a meeting of the key people on both sides was deferred until May 17th.
28. On May 17, 1955, a meeting was held between representatives of the plaintiff and of the defendant at the office of the defendant’s area engineer.
Those in attendance were as follows:

For plaintiff:

A. J. Kavanaugh, president
E. S. Kavanaugh, vice president
Stoner K. McLelland, general superintendent
John McLelland, project superintendent
Henry Johnson, materials and testing engineer
Calvin I). Ary, project engineer
Luther Bohanon, attorney

For defendant:

Col. Lynn C. Barnes, district engineer and contracting officer
Thomas B. Tillman, area engineer and authorized representative of the contracting officer
Ralph H. Hoss, paving engineer
Fermon B. Steadmon, office engineer
George I. Tippin, district paving engineer
Although there was some discussion concerning change orders, the major purpose of the meeting and the matters discussed had to do with factors affecting the progress of the work. The Government representatives noted that although there had been earlier delayed progress, the plaintiff’s progress had shown some improvement. The plaintiff’s representatives talked about requests for extensions of time which it had submitted earlier, amounting to an additional 95 days’ extension requested. It was urged that the plaintiff be granted a 30-day extension and the plaintiff’s representatives said that if this was done, it would withdraw all other claims. The extension of time was not granted. The contracting officer asked all present if there was any animosity or ill feeling shown between any of the plaintiff’s employees *446 and any of the defendant’s employees. No one present would admit that such animosity or ill feeling, if any, had been shown.
In the concluding part of the conference, the contracting officer told all of the Government representatives to do everything in their power to get the job on schedule and to keep it that way. He also requested the chief officers of the plaintiff to have the plaintiff’s employees similarly instructed.
29. From May 17,1955, until the end of the job, the plaintiff’s progress continued to show improvement. As the plaintiff’s president stated, “* * * From that time on, why, the job began to roll just as soon as the weather permitted.” The plaintiff has no quarrel with the defendant as to interference with the work after that time.
30. It is significant that the work done by the plaintiff on Contract 1251 had been finished just about 2 weeks earlier (finding 13).
31. It is also to be noted that although the work progressed well subsequent to May 17th, the defendant thereafter had not increased its testing personnel.
32. The contract work was finished on schedule with some time extensions granted due to weather and additional work. The plaintiff contends, however, that it could have finished the work 94 days earlier had the defendant not caused it delay due to the defendant’s lack of sufficient testing personnel and its improper rejection of aggregates.
33. The delays in the plaintiff’s progress in the early stages of the construction work were caused by the contractor diverting men and equipment to Contract 1251, and to the failure of the contractor to be selective in removing aggregates from the pits which, in turn, required an undue amount of testing and retesting due to the marginal nature of the aggregates delivered to the job. In addition, the plaintiff lacked sufficient compaction equipment in the early stages of construction. By the time the Groseclose job was completed (Contract 1251), and the other factors adverted to were corrected, the plaintiff was able to and did apply its men and equipment to the work under the contract in suit and was able to accomplish the remaining work with dispatch.
*447 34. Defendant’s laboratory crew consisted of three qualified technicians, who tested materials both before and after placement. The tests were to check densities, plasticity, number of fractured faces, and gradation. Each test took from 30 minutes to 2 to 3 days. Defendant had the usual laboratory equipment available to do this work. Plaintiff furnished, as provided by the contract, one untrained laborer to help in the laboratory, and also one piece of equipment to help speed up one of the tests.
35. Plaintiff also maintained a laboratory at the site. This was staffed by one man except during the period January 28,1955, to March 10,1955, when plaintiff also employed an engineer from a testing laboratory to assist in running the tests needed to get the job started.
36. Although no complaints were voiced during the progress of the work concerning the performance of the defendant’s laboratory personnel, plaintiff now contends that defendant would not inform plaintiff of test results, which refusal hindered plaintiff’s operations. In fact, the defendant posted the results of the tests on a board in the laboratory, and plaintiff’s engineers were permitted to and did visit the laboratory frequently to check the test reports.
37. On occasion the results obtained by defendant differed from those obtained by plaintiff, and when such difference did occur, the defendant re-checked its results, and if, on re-check, a different result, was reached, resolved the difference in favor of the plaintiff.
38. Due to the fact that much of plaintiff’s material was borderline, an unusual number of tests had to be made in the early months of the job. This caused defendant’s engineers to work overtime, and the chief laboratory man requested additional help so that more normal hours could be maintained. This request was not granted, and the overtime continued.
39. At various times plaintiff indicated its opinion that defendant’s lack of laboratory men and equipment was slowing down plaintiff’s operations. On each occasion this contention was investigated by the defendant, and a conclusion reached that the men and equipment furnished by defendant *448 were adequate for the job, and defendant did not at any time add laboratory men or equipment to the job.
40. During the period that the tests were being conducted, plaintiff moved its force to another area, in the customary manner, and there is no satisfactory evidence that any delay by defendant in making tests held up plaintiff at any time, nor is there any satisfactory proof that defendant unreasonably delayed plaintiff in any other manner during the progress of the work.
41. There is a claim of about $14,000 covering what the plaintiff calls extra hauling of select materials base course and extra hauling of stabilized aggregate base course. The plaintiff found it necessary to haul sand a distance of 18 miles as an additive to the materials it extracted from pits located closer to the work. The extra costs of such haul amounted to about $14,000. Since this claim is in the nature of a dispute concerning a question of fact, i.e., whether the material from the closer pits met the specifications; and, since the disputes clause was not invoked during performance of the work, no finding is made as to the details of the claim.
42. Plaintiff contends that the Barber Greene plant was ready to operate January 27, 1955, but that due to defendant’s procrastination in approving a mix, it was not permitted to operate until February 7th, a loss of 9 days’ production. The fact is that plaintiff attempted at the outset to use some stockpiles left by the previous contractor, Groseclose, which were so contaminated that they could not be used following the approved formula, and the time lost was spent in decontaminating the stockpiles. Once that was accomplished, plaintiff proceeded. The successor contracting officer found no delay due to defendant, and this finding is supported by the record in this case. The Standard Testing’s laboratory charge of $1,468.46 has no connection with this claim as the service was requested for plaintiff’s benefit, and not because of any act or omission of defendant.
43. Plaintiff contends that its Standard plant was ready to operate on February 10th and that defendant improperly prevented operation until February 16th. The facts are that February 10th and 11th were too cold for any paving opera *449 tions. Samples were taken from the plant and tested on February 12th (Saturday) and February 13th (Sunday) and the test strip was laid on February 14th. Testing of this strip took 6 hours to complete, and it was approved on February 15, 1955, and the plant went into operation on February 16th. The successor contracting officer found that the defendant acted expeditiously and this finding is supported by the record.
44. Plaintiff contends that acting on oral instructions it deviated from the plans, and prepared subgrade for widening in a certain location, which work had to be corrected when later instructions required plaintiff to follow the plans. There is no substantial evidence relating to this claim.
45. Plaintiff contends that it was improperly delayed in the period April 4^15, 1955, waiting on a test report which should have been available to plaintiff on April 4,1955. The facts are that except for periods when plaintiff had no base prepared and except for some repair periods, both plants were in operation. The successor contracting officer has found no delay as charged by plaintiff and his finding is fully supported by the record.
46. Plaintiff contends that due to an improper requirement of an inspector employed by defendant, it was unable to run one of its asphalt plants at full capacity, and thus lost a full day’s production. The fact is that an inspector did require plaintiff to operate at a lower speed because of the inability of the machine, when operated by plaintiff at a higher speed, to lay the material evenly. This matter was called to the attention of defendant’s paving engineer, who made certain suggestions for adjustment of the machine which were followed and which enabled plaintiff to operate the machine at a higher rate of speed, and efficiently. The fact is also that in the period February 7-14, the machine was not operating at all for 3 days, and on 3 other days it was operating on Contract 1251. The successor contracting officer found that defendant’s personnel acted reasonably, and this finding is fully supported by the record.
47. Plaintiff contends that certain overflow materials could have been used on the job, but that, due to defendant’s refusal to permit such use, additional materials had to be *450 purchased. The fact is that plaintiff did use this material, and thus suffered no monetary loss. The successor contracting officer so found, pd his finding is fully supported by the record.
48. The plaintiff, by its attorney, filed its claim, embracing each of the items discussed above, with the contracting officer on February 4,1958. The successor contracting officer, on August 11, 1958, denied the claim in its entirety, with detailed findings. No appeal therefrom was taken.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.