**GARDNER DISPLAYS COMPANY**
v.
**The UNITED STATES.**
No. 336–56.

United States Court of Claims.
June 11, 1965.

Henry M. Moore, Washington, D. C., for plaintiff. Geoffrey Creyke, Jr., and Hudson & Creyke, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

■ This case was referred pursuant to former Rule 45(a), now Rule 57(a), to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed on March 3, 1964. Exceptions were filed by the defendant, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court agrees with the commissioner's findings, his opinion, and his recommended conclusion of law, as hereinafter set

forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover and judgment is entered for the plaintiff in the amount of thirty-nine thousand, seven hundred fifty-four dollars and two cents ($39,754.02).*

OPINION OF COMMISSIONER

The central question here is whether a manufacturer of rubber terrain maps under contract with the Army may recover the increased costs of latex, the principal raw material ingredient, brought about as an economic byproduct of the Korean war during a period of Government-caused delay in inspection and approval of a preproduction model, where despite the delay the contractor still managed to perform within the contract time limits. United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944) says (to the defendant) he cannot, while Metropolitan Paving Co. v. United States, 325 F.2d 241, 163 Ct.Cl. 420 (1963), says that he can, but as we shall see the conflict is more apparent than real and rests upon a difference in operating facts.

■ Antecedent to this is whether the plaintiff prime contractor may maintain this action on behalf of its subcontractor Toyad, for the uncompensated loss was Toyad's. The subcontract contains no provision resembling the exculpatory type of clause which freed both the prime contractors and the Government from liability in such cases as Severin v. United States, 99 Ct.Cl. 435 (1943), cert. denied, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1943); Continental Illinois National Bank & Trust Co. v. United States, 81 F.Supp. 596, 112 Ct.Cl. 563 (1949); Continental Illinois National Bank & Trust Co. v. United States, 115 F.Supp. 892, 126 Ct.Cl. 631 (1953). Quite logically where the subcontract absolves the prime contractor from liability to his subcontractor there

---

* There was no objection to *de novo* evidence at the trial in the court and both parties introduced considerable *de novo* evidence. The court can therefore consider all the evidence including that produced *de novo*. Stein Bros. Mfg. Co. v. United States, 162 Ct.Cl. 802, 337 F.2d 861, (1963), and later decisions to the same effect.

can be no derivative liability of the Government to the subcontractor even where the Government would otherwise be culpable, for actual damage to the prime is a prerequisite to recovery either for himself or for those subordinate to him. Where the subcontract does not negate liability of the prime to his sub (J. W. Bateson Co. v. United States, 163 F.Supp. 871, 143 Ct.Cl. 228 (1958)), or where it is silent as to such liability (J. L. Simmons Co. v. United States, 304 F.2d 886, 158 Ct.Cl. 393 (1962)), recovery against the Government by one on behalf of another is generally permitted. Thus the present action may be maintained by the plaintiff for Toyad.

The Government misled and then delayed the plaintiff unreasonably. While desiring the production of latex terrain maps with a smooth surface, the Government inadvertently led the plaintiff astray at the outset by advising it to bid on the basis of a prototype produced by the Army Map Service which had a rough and pebbly surface. The plaintiff predicated its low bid on a fixed-price subcontract with Toyad for latex, which Toyad in turn based on the prevailing market price with a reasonable margin for normal increases. All of this was in 1950 on the eve of the Korean war which started June 25, 1950, although the contract itself was entered into in July and backdated to June 26, 1950. The price of latex advanced rapidly from then to the end of the year when price controls were instituted. Toyad could not adequately protect itself against price advances by purchasing and storing all of its contract requirements for latex, for although it had sufficient storage facilities it is not considered feasible to store latex for longer than four months because of its perishable nature, even under controlled conditions. Toyad actually ordered its total latex requirements prior to the Korean war and so insured its availability when needed, but the price at the time of delivery governed, and naturally Toyad was reluctant to run the risk of spoilage should circumstances prevent use of the latex during its storable life. The plaintiff submitted for inspection a preproduction sample map on August 30, 1950, which was eventually rejected because of the discovery by Army afterthought that the surface was too rough to permit marking of roads, etc., with an ink roller, even though it was faithful to the surface texture of the prebid Army prototype. The contract nowhere described the desired surface texture, nor did it affirmatively require the texture to be such as to take markings from an ink roller. The inference that the contractor should have divined this requirement from the fact that it was to provide ink rollers as part of the map kit is more than countervailed by the direction to copy the prebid prototype, the only tangible clue the Government had provided as to the surface texture it wanted.

The plaintiff's preproduction sample rejected by the Government following the inspection on August 30, 1950, represented the end product of an elaborate sequence of models, plaster molds, and cast aluminum production molds. Rejection on grounds of surface texture meant the scrapping of the aluminum molds and the repreparation of a new surface for the plaster mold, followed by recasting the aluminum molds. These were expensive and time-consuming operations. Their difficulty was enhanced by the inexplicable failure of the Government to advise the plaintiff of the surface it wanted or how it was to be achieved. By December 1950 the plaintiff prepared additional preproduction samples having a smoother surface texture, but through further procrastination on the Government's part the final approval for production was withheld and not issued until February 19, 1951, while under conditions of reasonable cooperation approval should have been forthcoming about November 1, 1950. On the one hand the Government expressed to the contractor its urgent need for the maps for military training purposes, on the other by its failure to act it delayed the contractor's performance, and all the while the cost of latex was zooming until it was stabilized by a

price freeze on January 1, 1951. By issuing a change order in June 1952 officially defining for the first time the desired surface texture and providing for the payment to plaintiff of $5,505.51 as an equitable adjustment for the cost of changing molds the defendant by strong implication admitted not only that it had changed its original surface texture requirements, but also that it was capable of reducing the description of the desired surface texture to writing. It did not, of course, admit to unreasonable delay in the circumstances surrounding the change, but this is abundantly clear in the report of facts accompanying this opinion.

The plaintiff proceeded with dispatch on receiving production approval on February 19, 1951, and met all the delivery requirements of the original contract which specified deliveries commencing March 28, 1951. The requirement of the original contract for a production test model to be ready on or before February 28, 1951 was also met, in spite of the delays which had been experienced. Obviously the Government in fixing these dates last referred to either overestimated the time requirements badly, or underestimated the plaintiff's capacities, for had it not been for the delays the plaintiff would have been able to complete the contract long before its formal requirements.

It is this circumstance that causes the defendant to rely on United States v. Blair, supra, where it was held that nothing in the contract required the Government to aid plaintiff in completing his contract *prior* to the contract completion date and that damages claimed for delay could not thus be sanctioned. In that case a delinquent Government contractor delayed the plaintiff, and the court ruled that "Nowhere is there spelled out any duty on the Government to take affirmative steps to prevent a contractor from unreasonably delaying or interfering with the attempt of another contractor to finish ahead of his schedule." This is readily distinguishable from the case

under consideration, for here it was the Government itself which was at fault for the delays and not another contractor. The plaintiff's contract required the Government to make inspections and tests "in such manner as not to unduly delay the work." This promise, plus the obligation implied in every contract that the Government shall not hinder the contractor in his performance, have been breached through no fault of an intervening or independent third party. In Metropolitan Paving Co. v. United States, supra, a case more comparable to the present, the court distinguished the Blair precedent in these words, 325 F.2d at 242, 163 Ct.Cl. at 423:

> But a close reading of Blair, supra, does not support defendant's position. While it is true that there is not an "obligation" or "duty" of defendant to aid a contractor to complete prior to completion date, from this it does not follow that defendant may hinder and prevent a contractor's early completion without incurring liability. It would seem to make little difference whether or not the parties contemplated an early completion, even whether or not the contractor contemplated an early completion. Where defendant is guilty of "deliberate harassment and dilatory tactics" and a contractor suffers damages as a result of such action, we think that defendant is liable.

On June 11, 1954, the Armed Services Board of Contract Appeals dismissed plaintiff's appeal from the adverse decision of the contracting officer. The decision was based on a rigid application of the Blair decision. Thus the Board decision was purely on a question of law and offers no barrier of finality under the disputes clause.

Time and events have somewhat eroded the much-maligned doctrine of United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), but even granting its continued health and vitality its restriction of a contractor to a mere time

extension as full contract payment for the financial consequences of reasonable delay flowing from a change order does not apply to preclude monetary damages for that part of a delay found to be unreasonable. In failing to expeditiously order the plaintiff to change the surface texture, in failing to instruct the plaintiff as to precisely what it wanted, and in its dilatory and inconclusive inspection and approval procedures as described in the findings, the Government exceeded reason and brought itself within the scope of F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 397, 131 Ct.Cl. 501, 506 (1955):

> * * * It is settled that the defendant is allowed under the contract only a reasonable time within which to make permitted changes in the specifications and that the defendant is liable for breach of its contract if it unreasonably delays or disrupts the contractor's work.

■■ The final issue is whether the increased latex costs which the plaintiff seeks as a measure of his damages were the proximate result of the defendant's breach, or were consequential to the Korean war and thus not recoverable under one way of construing Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), and Ramsey v. United States, 101 F.Supp. 353, 121 Ct.Cl. 426 (1951), cert. denied, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). Had the Korean war not occurred and general conditions affecting the price of latex remained normal, it is likely that the price would have remained within the margin which plaintiff had allowed in the computation of its bid, and so no damage could be shown to have resulted from the Government's delay, assuming that no other damages were claimed. In this sense it could be said that the plaintiff's damages resulted from the Korean war and not from the defendant's contract-breaching conduct. But the reasoning is specious for war is but one of many causes of cost increases, most of which causes are beyond the sphere of Government participation but are instead the product of economic or political conditions no more subject to Government control than is an unwanted war. As an example, artificial price increases inspired by a conspiracy among producers might have boosted latex prices and given the Government reason to label them as consequential to the conspiracy and not proximate to the breach, and hence not reimbursable. The true concept of consequential damages involves consideration of the type of loss foreseeable by the contracting parties at the time of their agreement. When the Government contracts it implies an obligation to respond in damages for any unreasonable delays which it may commit during contract performance, including increased material costs as in the present case. The cause or cost of such increases is not in every case material to and does not determine their foreseeability. There may even be valid reason to fix the foreseeability at the time of the breach rather than at the time of the agreement, for it is at the breach time that the consequences of wrongdoing are more apparent and assessable, and the deterrent accordingly greater. To illustrate, if the concrete results of delay in the form of war-inflated prices were not apparent to the Army when it awarded plaintiff the contract in suit just prior to the outbreak of the Korean war, most certainly the consequences became obvious in September 1950 when the breach occurred, for by then latex prices were on a rapid rise and the Army's risk more palpable. The parties have suggested no precedent where war-borne increases in the price of materials have been considered consequential to the war, and not the result of delays by the Government, so as to preclude their recovery. In Levering & Garrigues Co. v. United States, 73 Ct.Cl. 566 (1932), the increase in cost of bricks during a period of delay by the Government was considered a recoverable item of damages without inquiry into the cause or foreseeability of the increase. Such claim items are common in Government contract actions for delay-damages; contentions that they are not recoverable because they are consequential rather

**590**

than proximate are not.[1] For a more extended discussion of the doctrine of consequential damages as it applies in Government contract cases, see Appeal of Carteret Work Uniforms, ASBCA No. 1015, decided July 25, 1952, and Law of Government Contracts, McBride & Wachtel, Vol. IV, Chapter 32.

Findings 53 through 70 relate to the ascertainment of the plaintiff's damages. Based on the conclusion that the Government's approval of the plaintiff's product for production on February 19, 1951 was due on November 1, 1950, and that the plaintiff's damages are measured by the increased cost of its latex purchases in the later period, the plaintiff is entitled to recover the sum of $39,754.02 as damages for the defendant's breach of contract.

1. In fact, neither this issue nor any others of a legal nature discussed in this opinion were raised by the defendant in its brief to the commissioner, who concluded that they needed consideration nevertheless.