**BANKS CONSTRUCTION COM-PANY, Inc.**

v.

**The UNITED STATES.**

**No. 17–64.**

United States Court of Claims.

July 15, 1966.

---

Edgar L. Morris, Columbia, S. C., attorney of record, for plaintiff.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

## OPINION

PER CURIAM:

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 1, 1966. Plaintiff has filed no exceptions to or brief on this report and the time for so filing, pursuant to the rules of the court, has expired. On May 2, 1966, defendant filed a motion that the court adopt the report of the commissioner and that plaintiff's petition be dismissed accordingly. Since the court agrees with the trial commissioner's opinion, findings and recommendation, with one slight modification, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER *

BENNETT, Chief Commissioner:

Plaintiff, Banks Construction Company, Inc., was awarded a contract (No. DA–38–081–ENG–547) by the United States Government, acting through the contracting officer, Charleston (S.C.) District, Corps of Engineers, United States Army, for the construction of secondary roads, a storage or salvage area and drainage ditches at Myrtle Beach Air Force Base, Myrtle Beach, South Carolina. Additional costs were incurred throughout the performance of the contract. Plaintiff contends that these extra costs were not within the contemplation of the contract but were due solely to defendant's breach of the contract. A claim for these additional costs was submitted to the contracting officer pursuant to the procedure provided by the "Disputes" clause of the contract but was denied in all but one respect.[1]

Successive appeals to the U. S. Corps of Engineers' Board of Contract Appeals, hereinafter referred to as Eng. BCA, and the Armed Services Board of Contract Appeals, hereinafter referred to as ASB CA, were denied in all but one respect.[2]

The case is before the court on an assignment of errors filed by the plaintiff challenging the administrative decision as not supported by substantial evidence.[3] The assignment of errors is to the administrative record. No *de novo* evidence has been taken before the court.[4]

Plaintiff has concluded its assignment with a prayer that the "entire case be heard *de novo* by this Court, and in the alternative, that this Court * * * award * * * judgment against the defendant in the amount of One Hundred Forty Thousand Two Hundred Eighty-Five and 67/100 ($140,285.67) Dollars * * *" plus interest, attorney's fees and costs. For reasons hereinafter dis-

---

* The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 57(a). The facts are stated in the opinion.

1. Decision dated November 30, 1959, That portion of the claim pertaining to the cutting of the 108-inch corrugated pipe was granted.

2. A claim for damage inflicted to Z road by military vehicles was allowed. See decision of Eng. BCA, No. 1848, August 22, 1962, and decision of ASBCA, No. 8659, December 3, 1963.

3. In the petition to this court, plaintiff alleged the board's decision (ASBCA) "was so arbitrary, capricious and contrary to the weight and sufficiency of the evidence * * * as to be so grossly erroneous as to imply bad faith * * *." Plaintiff, however, in its assignment, claims only that the decision was "not supported by substantial evidence."

4. On August 27, 1964, the court denied, without prejudice, the defendant's motion to dismiss. Plaintiff was allowed to amend its petition to state a proper claim that could be considered on the merits. On September 29, 1964, the court, without opposition, granted defendant's motion to limit review in this case to the administrative record. On October 21, 1964, the commissioner issued a pretrial order pursuant to which the administrative record was filed with the court and the plaintiff submitted an assignment of errors thereto. The parties have briefed the assignment.

cussed in the first assignment, plaintiff is not entitled to a trial *de novo*. The reasons believed to bar judgment for plaintiff will be discussed in connection with the remainder of its assigned errors.

The facts pertinent to the determination of the case are related fully in each assignment hereinafter discussed, but a general recitation of the facts as developed by the record will afford a background for the discussion to follow.

Pursuant to an invitation for bids, plaintiff's contract was executed on December 31, 1956, and was to be performed within 300 calendar days after receipt of notice. The notice to proceed was acknowledged on January 15, 1957, and the original completion date was November 11, 1957. Eighteen modifications were issued, increasing the contract price and extending the time for completion to August 19, 1958.

The Air Base is located on the narrow strip of land between the Atlantic Ocean and the Atlantic Intracoastal Waterway. The area is flat and swampy. The elevation within the area of construction was between 12 and 13 feet above sea level at those points nearest the ocean and waterway, with a maximum elevation of 23 feet above sea level. The Air Base is completely bounded by private or state and county property.

Prior to the submission of its bid and in accordance with the site-investigation requirement of the invitation and specification GC–3 of the general conditions, plaintiff's president visited the site of the work before bidding. In pertinent part that provision provided that the contractor satisfy himself "as to the nature and location of the work, the general and local conditions, including but not restricted to those bearing upon * * * uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, * * *." It also provided that the contractor was not relieved from responsibility for estimating properly the difficulty or cost of successfully performing the work as a result of failure to acquaint himself with all available information as to obstacles to be encountered insofar as the information was reasonably ascertainable from an inspection of the site, all exploratory work done by the Government and the information presented by the drawings and specifications.

Plaintiff was to construct roads designated as A, B, F, J, Y, Z and one designated as Patrol Road. As an integral part of the construction of the roads, plaintiff was to construct parallel ditches. The ditches were to provide drainage for the newly constructed roads. The plans furnished the plaintiff contained information concerning the existing terrain features of the Air Base and the work to be performed. The existing terrain features included an existing road network, certain facilities already in place, and existing drainage ditches. Arrows indicating the direction of the flow of water were placed on the drawings alongside the existing ditches as well as the ditches to be constructed by the plaintiff. The information relating to the work to be constructed by the plaintiff was minutely detailed and precise in that it showed required elevations of roads, depth of drainage ditches, grades of roads and ditches, direction of flow of water in the ditches, readings in metes and bounds of the roads, slopes of road shoulders, and configuration of ditches. The work prescribed was to be performed in strict accordance with the general provisions, specifications, schedules, drawings, and conditions, all of which were part of the contract.

The drawings further showed that the ditches to be constructed by plaintiff were to connect with existing ditches and canals, so that the water flowed through the former into the latter which led off the military reservation. The plans also refer to the location of points of outfall, the points where water was to drain beyond the military reservation.

The existing ditches within the plaintiff's work area and those outside the boundaries of the Air Base and not within the work area were somewhat overgrown with vegetation. This was readily

apparent from an examination of the site of construction and was noted by plaintiff's president, Mr. Gary Banks on the occasion of his prebid visit. At that time he had walked about the work area with particular interest focused on the availability of drainage. It was his opinion that drainage would be difficult to obtain because, as to drainage, "the whole situation there was lousy and in pretty foul shape."

Apart from this observation, he was not otherwise concerned at this time with drainage of the worksite. He had concluded from an examination of the contract documents that drainage beyond the reservation (outfall drainage) was not plaintiff's responsibility and assumed that the defendant would be responsible and correct any deficiency which might exist. The contract, however, contained no provision relative to the parties' respective responsibility for providing drainage, or that defendant would regrade, clear, clean or otherwise remove the vegetation from the ditches. Mr. Banks made no request for clarification of this matter before entering into the contract.

Plaintiff began construction on January 17, 1957. Shortly thereafter, it began to rain and continued throughout much of the period of construction, with a total amount of 52.56 inches. The quarterly totals were as follows:

| | | |
|---|---|---|
| 1957, 1st Quarter | 10.44 | inches |
| 2nd Quarter | 11.00 | inches |
| 3rd Quarter | 10.88 | inches |
| 4th Quarter | 10.41 | inches |
| 1958, 1st Quarter | 9.83 | inches. |

Partly due to the plaintiff's failure to keep the ditches it constructed free of debris and partly due to the slowness with which the existing ditches were draining because of the overgrowth of vegetation, as well as the slowness with which the water drained beyond the work area, but primarily because of the abnormally heavy rainfall in an otherwise low-lying, swampy area, drainage of plaintiff's work area became a significant problem. On April 11, 1957, representatives of the defendant and plaintiff met to discuss the alleviation of this problem. Plaintiff at the time was primarily concerned with outfall drainage at station 80+46 of F road. The record does not disclose all areas which were specifically discussed but on April 15, 1957, plaintiff wrote the project engineer, Lieutenant Colonel John Hassell, in an attempt to ascertain what provisions had been made for outfall drainage. By letter dated April 17, 1957, plaintiff was requested to proceed in accordance with the plans and specifications. However, on April 18, 1957, the contracting officer authorized plaintiff by telegram to clear and clean the outfall ditch on F road. The ditch was draining surface water and continued to do so even during the clearing operation. Pursuant to these instructions the work was performed and some relief was afforded, though not as beneficial as plaintiff had hoped. Plaintiff maintained that it was necessary to regrade the ditch in order to obtain maximum drainage,[5] but nevertheless proceeded to perform the contract work while encountering continued drainage difficulties. The rain continued intermittently, plagued plaintiff's efforts, and significantly contributed to the amount of water which remained in the swampy work area.

The water that remained in and about the work area saturated the shoulders of various ditches which plaintiff had dug and destroyed their shapes. Other completed work was also damaged because of the erosive effect of the water. Plaintiff was enduring considerable hardship

---

5. In August 1958, when work was substantially completed, the Air Force requested the Corps of Engineers to rebuild the culvert under Hucks Road by installing a 48-inch drain, in place of the existing 24-inch drain, and to grade a drainage ditch a distance of some 400 feet below Hucks Road and away from the reservation. This was accomplished by change order No. 17 for which plaintiff was paid. This work was done on property not owned by defendant.

and difficulty but, despite the amount of rain and the restriction of the rate of flow, one salient fact remains—the ditches did drain, albeit not as rapidly as plaintiff would have liked. The work, understandably, was behind schedule and in response to a letter dated October 9, 1957, from the project engineer, Mr. Banks stated, in part:

> Our above named job, is at this time somewhat behind schedule, only because of abnormal rains. We have had equipment and personnel on the job standing idle for no other reason than excessive rains. We have absolutely no control over the elements other than to pray. And, in this matter of the elements, we would certainly appreciate your consideration and help.

Additional letters were sent by plaintiff dated November 11, 1957, and December 19, 1957, concerning the lack of progress. In each, excessive rains and the inability to obtain compaction because of the wet conditions of the work area were stated to be the reasons for the lack of progress.

On January 22, 1958, plaintiff requested the period of performance be extended 97 days. That letter stated in pertinent part:

> On account of the excessive inclimate (sic) weather recurring in the last 12 months on the Myrtle Beach Air Force Base, our job progress has been greatly retarded and often brought to a complete stop. The attached records show that the rain which occurred during that period fell at such intervals that in most cases the job was not reasonably dried from previous rains before it was rained upon again.

The records submitted with the request show that a total of 182 days were lost on account of weather. Normally, only 5 days per month are expected to be lost in the area because of inclement weather. Here, this amounted to 75 days for the extended period of construction. By change order No. 13, dated April 2, 1958, the time for completion was thus extended 107 calendar days. The plaintiff acknowledged receipt of the change order on April 4, 1958, and expressed its appreciation for the extension, stating:

> * * * As there are no contract provisions for compensating the contractor for his repeated efforts to maintain a job through such destructive rains as we have been experiencing, the time extension will at least decrease the penalties imposed as a result of such delays due to rain.

On October 8, 1958, pursuant to the procedure prescribed under the disputes clause of the contract, plaintiff, through his attorney, filed for the first time a claim[6] for additional costs alleged to have been incurred as a result of the defendant's (1) failure to provide outfall drainage in accordance with contract documents, (2) failure to maintain the drainage system under its control as shown on the contract documents, (3) accumulating and bringing water onto the contractor's work and damaging it, (4) faulty and incorrect design causing damage to work completed by the contractor, (5) requiring the contractor to execute work not shown on the contract documents, (6) failing to furnish the contractor with data in its possession as to subsurface conditions at the jobsite, and (7) inflicting damage upon work completed by the contractor and requiring its reexecution.

The crux of plaintiff's complaint in this letter was that the Government, by designing the work to be done, assured the adequacy of the drainage facilities and that the Government had permitted the existing ditches and canals to remain in a state of disrepair so that they accumulated water which was thrust upon and over the completed work and destroyed it; and, further, that personnel of the Government excavated ditches which collected water that drained onto plaintiff's work and destroyed it. Plaintiff now asserted that weather had noth-

6. This claim letter was amended by letters dated January 30 and October 12, 1959, which further particularized plaintiff's complaint.

ing to do with the situation complained of since by designing the work the defendant warranted the adequacy of the ditches to drain surface waters.

Plaintiff appealed the adverse decision on its claim by the contracting officer, as heretofore related. Each of the appeals to the Eng. BCA and the ASBCA, as did the original claim submitted to the contracting officer, alleged that the contract was breached in the above respects and asked for a change order to compensate plaintiff for increased costs. The ASBCA decision upon which the assignment of errors is now based substantially dismissed the claim.

Although it considered the respective obligations and duties of the parties under the contract, the ASBCA decision rested primarily on the conclusion that plaintiff's difficulties were caused by the failure of abnormal rain to drain promptly after it passed beyond the reservation boundaries, a conclusion for which substantial support is found in the record.

*First Assignment*

In its first assignment, plaintiff states that the basis of its administrative appeals was for breach of contract,[7] which issue was ignored by the Government. Thus, it contends, no determination having been made with respect to the breach-

of-contract claim, this court is not precluded from considering that issue on review.

Defendant contends that the claim can readily be characterized as one within the reach of the standard changes article of the contract and that, having resorted to the administrative process which included "a substantial amount of time, trouble and expense for the administrative agency," plaintiff should be estopped from denying the factual determinations made by the Agency are within the disputes provision of the contract and related provisions of the Wunderlich Act. H. R. Henderson & Co. v. United States, 169 Ct. Cl. 228, 245 (1965).

The inconsistency of plaintiff's position on the issue of a *de novo* trial merits comment. Plaintiff states that its case has been premised from the beginning on the theory of breach of contract. Reference to its claims of October 8, 1958, January 30 and October 12, 1959, to the contracting officers shows that plaintiff sought a change order for additional compensation premised on alleged breach of contract and on the need for more expensive construction methods than anticipated. The same is true of both of plaintiff's appeals to the boards. The contracting officer and the appeals boards

---

7. After plaintiff's complaint had been filed with the Eng. BCA and the Government's answer received, counsel, by letter dated February 10, 1961, addressed to the Chairman, Corps of Engineers Board of Contract Appeals, asked whether, in view of the allegations of breach of contract contained in its petition, the Eng. BCA had jurisdiction of the controversy. The Assistant Chairman replied in part on February 14, 1961, as follows:

It is true that the Board would be without jurisdiction to grant relief on account of a breach of contract by the Government. On the other hand, the Board does have jurisdiction where administrative relief is proper under the terms of the contract and will exercise it in such situations where the facts so indicate even though the parties mistakenly make reference to a "breach of contract". A brief review of your complaint discloses that, if you are successful in substantiating the facts therein

alleged, your appeal may be one of the type described in the latter part of the preceding sentence.

Counsel took offense to the inference of mistake in stating his claim and sought again to be advised whether the board had jurisdiction of the claim. The Assistant Chairman again replied that he could not furnish any assurance that allegations set forth constituted a breach of contract, and advised that counsel could withdraw the dispute and proceed in whatever channels he desired. The dispute was thereafter docketed by the Eng. BCA and a hearing held. Prior to the ASBCA hearing, a motion to dismiss the complaint was filed by the Government alleging that the board had no jurisdiction over the claim because plaintiff's complaint was premised on breach of contract. Plaintiff resisted. No decision can be found in the record and I assume the motion was denied, for a hearing was held before the ASBCA.

disregarded the alleged breach as plainly outside their jurisdiction. This could not have mislead plaintiff who had also invoked jurisdiction of the appeals boards for failure of the contracting officer to grant a change order. Had plaintiff been able to prove its case, it would have been entitled to equitable relief administratively under one of several contract clauses: Clause 3, Changes; Clause 4, Changed Conditions; Clause 5, Termination; or GC–11, Suspension of Work. Plaintiff was given assurance that this could be done, as previously noted.

▆▆ Thus assured, and confident of its rights and obligations to proceed with administrative appeals as required by the contract, plaintiff produced numerous exhibits and offered the testimony of 11 witnesses, the combined hearings totaling 647 pages of transcript. Plaintiff has not shown the court that a third hearing would be anything but cumulative of an already voluminous record. Findings have been made administratively and in detail on all facts necessary to determine any legal issues involving interpretation of the specifications. By its lack of objection to defendant's motion to limit proceedings to the administrative record and by its uncontested acceptance of the commissioner's pretrial order for assignment of errors limited to that record, plaintiff has effectively waived any right it may have had to a *de novo* trial and is estopped to claim one. Further, as plaintiff could have received equitable relief through the procedures of the disputes clause of the contract had it proved its allegations in support of its request for a change order to meet increased costs, it is not entitled to a *de novo* trial as a matter of law simply by claiming a breach of contract. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965).

▆ The other assignment of errors will not be considered against the background of evidence reflected in the administrative record and the sufficiency of the record and finality of prior decisions thereon will be tested against the criteria of the Wunderlich Act of 1954.

68 Stat. 81 (1954), 41 U.S.C. §§ 321–322. If the administrative decision falls before these criteria, the court can, as it has in the past, recognize changes or changed conditions or a suspension for convenience of the Government and grant equitable adjustments therefor or allow damages for breach of contract, if proved. General Casualty Co. v. United States, 127 F.Supp. 805, 130 Ct.Cl. 520 (1955), cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266; T. C. Bateson Constr. Co. v. United States, 319 F.2d 135, 162 Ct.Cl. 145 (1963); Hoffman v. United States, 340 F.2d 645, 166 Ct.Cl. 39 (1964); E. H. Sales, Inc. v. United States, 169 Ct.Cl. 269, 340 F.2d 358 (1965); Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965).

### Second Assignment

The second error assigned is that "the administrative decision erred in holding that plaintiff was responsible for the provision of off-jobsite disposal of runoff water, although not provided for in the contract documents." Plaintiff argues that the contract did not specify that plaintiff was to provide the outfalls, and no adequate provision was made by the Government to accommodate the water collected by the drainage system designed by it. A registered engineer who testified on plaintiff's behalf before the Eng. BCA said that the Government would be responsible, in his opinion, for the provision of the outfalls and their failure along with any inadequacies or defects in design would be the responsibility of the Government. Plaintiff also contends that the necessity to provide outfall drainage was brought to the attention of the representative of the Government on April 11, 1957, but that timely remedial action was not taken by defendant and that water was thus caused to accumulate and flood the work at stations 80+46 and 129+58.9 of F road. Such delay, plaintiff claims, is a breach of contract.

The defendant contends that there is no contract provision relative to off-jobsite disposal of run-off waters and nei-

ther the plaintiff nor defendant was legally responsible for off-site drainage. According to defendant, plaintiff assumed a contractual responsibility to construct roads and in so doing assumed the risk that it could do so, including the risk of abnormal rainfall.

With respect to the notification of April 11, 1957, defendant states that the Government, although not required to do so, issued an authorization to plaintiff on April 18, 1957, to clean out and grub approximately 1,200 feet of a ditch which was the outfall at F road about which plaintiff was complaining.

The ASBCA acknowledged that drainage beyond the reservation, which was to be accomplished by the outfalls, was slow and that had the work ordered by change order No. 17 been made a part of the original contract, the drainage of the area in question would have been facilitated. It also found that "it does not follow that the Government was responsible, as a matter of contract, for the difficulties encountered by the appellant or that the appellant would not have still had a problem because of the abnormal rainfall." It also acknowledged that failure to provide for disposal of run-off water beyond the reservation was an error in design, but such disposal "was over and above the scope of the design agreed to by the parties. The scope of design, as agreed to by the parties, was simply more difficult of execution because of the abnormal rainfall."

The board also found that the "only evidence of contract liability cited by the appellant for responsibility of the Government to provide adequate disposal of run-off waters beyond the Government reservation is the fact that the arrows alongside the existing outfall ditches implied that the Government would provide for such disposal. While the appellant initially also cited a contract provision providing responsibility of the appellant for the maintenance of ditches constructed by the appellant until acceptance by the Government and thus implied responsibility of the Government to maintain existing outfall ditches, the overwhelming evidence establishes that such maintenance contributed little, if any, to the difficulties of the appellant. * * * the problem was caused by the failure of abnormal rainfall to drain promptly after it passed beyond the reservation boundaries."

It was further held that the "arrows were clearly, by admission of the parties, symbols indicating the direction of flow of water. However, such a symbol does not indicate the rate of flow, the condition of the ditch, total capacity of the ditch, total square area which it serves, the nature of the disposal area beyond the Government reservation, etc."

The board's opinion does not, as alleged, hold that the plaintiff was responsible for off-jobsite disposal of water. Plaintiff has obviously assumed that since the Government was not held responsible, it must have been held responsible. This does not follow. The evidence is that the outfall ditches were not under control of the Government. The contract was silent as to responsibility of the parties for the outfalls.

If, in contending that the Government was responsible for providing outfall ditches which would accept run-off water from the work area, plaintiff means that such facilities would be available, one must agree that the contract documents showed, and the parties contemplated, that the water which collected in the ditches located in the work area would drain off the reservation at various indicated points along the reservation boundary. Such facilities, however, were available.

The crux of plaintiff's arguments is really that the facilities available were inadequate, i. e., drainage was not sufficiently rapid to prevent water from remaining in the ditches within the work area. There is substantial support in the record for this view. However, whether the defendant had the responsibility to provide rapid or complete drainage depends upon an interpretation of the contract which was silent thereon.

█ It is well settled that where the Government orders a structure to be

built and in so doing prepares specifications prescribing the character, dimension and location of the construction work, the Government implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (June 1965), and authorities cited.

■ As has been noted, the plans here merely showed that water was to leave the work area at designated points. The arrows alongside the ditches represented the direction of the flow and in no way indicated—either from an examination of the plans or as a result of the custom or usage of the trade—the rate of flow. No representation was made by defendant that drainage would be at a rapid rate, or any particular rate, or that water would not remain standing in the ditches in this flat, swampy area. In the absence of such representations, it cannot be said that defendant was to blame when the outfall ditches failed to carry the water from extraordinary rains as rapidly as plaintiff desired. The plans clearly indicated the elevations and grades of the ditches which were subject to plaintiff's inspection. As the Supreme Court said in Christie v. United States, 237 U.S. 234, 245, 35 S.Ct. 565, 569, 59 L.Ed. 933 (1915), "We do not think, therefore, that there is anything in the contract which cast upon the government a prophecy and anticipation of abnormal conditions, or which relieved claimants from the risks of their occurrence or of whatever they might encounter in the work. It is to be supposed that contemplation and judgment were exercised not only of certainties but of contingencies, and allowance made for both at the time of bidding, * * *."

Plaintiff alleged in its complaint before the ASBCA that by faulty and incorrect design, the Government caused damage to work already completed. The board found that the design of the project had a number of minor errors normally encountered in a project of this nature, but that the evidence indicated these errors were corrected in a timely manner. The plaintiff's brief merely states that it does not agree the defects in design were minor, although it conceded that most project designs have errors. This being so, it continues, the defendant would have an even more demanding duty to correct such errors promptly when they were brought to its attention. It is claimed, therefore, that "delays of 6 months and 17 months" in the issuance of change orders for the correction of two such deficiencies were unreasonable.

■ It was incumbent upon the contracting officer to investigate or correct faulty contract designs and issue change orders where appropriate. If the contracting officer delay the contractor an unreasonably long time by failure to make corrections in faulty design, there would be a breach of the ever-present obligation to carry out its end of the implied contractual bargain not to impede the contractor's progress. J. D. Hedin Constr. Co. v. United States, supra. But, even if the defendant had represented that a "rapid" flow would be maintained and the rate was not as rapid as plaintiff therefore had reason to anticipate, plaintiff has not shown the rate of flow which was anticipated, the displacement which was expected, or the rate actually achieved.

■ With respect to the alleged delay of 6 months, plaintiff had claimed that although water was impounded in the general area to the west of station 114 of Patrol Road, it proceeded with the work but that the subbase of the road became unstable. Plaintiff had further claimed that no relief was obtained from the Government, after protest, until 6 months later when the Government authorized an 18-inch culvert and a cross-line pipe and outfall ditch tying into the main drainage canal on the east side of Patrol Road. Plaintiff's engineer, who performed the layout work and prepared the estimate, stated that the work was accomplished by change order issued in July. During construction in this

area, plaintiff received oral instructions to put in the cement for which the change order was subsequently issued. The witness did not, however, recall when the change order was requested. Mr. John Igau, one of plaintiff's employees who performed the digging of the ditches, stated that he began his work on March 16, 1957, and remained on the job until June 8, 1957. He stated that he encountered difficulty with ponding of water at station 114 of Patrol Road. Of this period of 84 days in which Mr. Igau remained on the job, it rained 13 days and 12 others were too wet to work. Mr. Igau had worked in the area of the Patrol Road but did not know the specific dates he worked there. The change order in question (No. 7) was issued on July 16, 1957, and accepted by the plaintiff. Since the evidence does not show when a request was made for the change order but does show one was issued, it cannot be said that the board erred in finding a timely correction of the defect.

The alleged delay of 17 months concerns the alleged failure to provide outfall drainage at certain points along F road. As has been noted, plaintiff brought this matter to defendant's attention at a meeting on April 11, 1957. On April 18, 1957, authority was given to clear and grub the ditch. Plaintiff insists that grading and enlargement of the ditch should also have been ordered at that time. The culvert subsequently was enlarged and the ditch graded at the request of the United States Air Force and added to the contract by change order No. 17, dated August 7, 1958. Arrangements had to be made to accomplish this work on property not owned by defendant and where defendant had no easement.

If the defendant had represented that a certain amount of drainage could have been anticipated or if plaintiff could rightly have assumed that construction would necessarily be performed under conditions where little water in the work area would interfere, defendant would probably have had a duty to provide adequate drainage promptly at the risk of hindering plaintiff's performance. Gardner Displays Co. v. United States, 346 F.2d 585, 171 Ct.Cl. 497 (June 1965); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964); Dale Constr. Co. v. United States, 168 Ct.Cl. 692 (1964); Volentine & Littleton v. United States, 169 F.Supp. 263, 144 Ct.Cl. 723 (1959). In a drainage system such as the one in question, the ability of the ditches within the work area to drain is dependent upon the propensity of the water to drain beyond the reservation. However, by his examination of the plans and of the work area, plaintiff's president, prior to bidding, knew that the degree of incline of the ditches was slight, the work area was low and swampy, the outfall ditches were overgrown with vegetation, and drainage would be difficult to obtain.

Notwithstanding this condition, some relief was afforded plaintiff by the authorization of April 18, 1957, permitting clearing and cleaning of the outfall ditch on F road. The Government did not then consider regrading of the ditch to be necessary. The fact that the Air Force subsequently ordered a regrading and paid plaintiff for it is not conclusive of the defendant's obligation under the contract which was silent on responsibility of the respective parties for outfall drainage. In fact, the evidence shows that water did not remain in this area throughout the construction and one can only speculate on the benefit such grading would have had in facilitating plaintiff's work. Any assistance by the Government would probably have made plaintiff's work easier. It does not follow that any failure of the defendant to make a contractor's work easier is a hindrance or impediment for which the defendant would be liable. Willems Industries, Inc. v. United States, 295 F.2d 822, 155 Ct.Cl. 360 (1961), cert. denied, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). Nor has plaintiff established that its performance was unreasonably delayed nor how much it was delayed by defendant's not having issued change order No. 17 sooner than it did.

### Third Assignment

Plaintiff assigns as a third error the failure of the administrative boards to hold that the "Government was liable for damage to plaintiff's work caused by the non-functioning of drainage ditches retained under Government control, which were significant parts of an entire drainage system."

Plaintiff contends that the preexisting ditches within the reservation were not in operating condition and when it made urgent representations about this to the official government representative, nothing was done. It is claimed that it was not plaintiff's but the defendant's responsibility to rework these ditches. Thus, plaintiff maintains, since the existing ditches would not drain properly, the ditches it constructed would not work either for they were tied together. Plaintiff says that defendant should have provided for water to drain away quickly. Plaintiff also contends that this failure constituted a defect in the plans and specifications which the Government was obliged to correct promptly.

Defendant maintains that the existing ditches did drain and that if it "were true [that ditches did not operate] it is something plaintiff's representatives could have determined for themselves on the occasion of their prebid visits to the Air Base and—it should be added—consonant with their duties under paragraph GC–3 of the General Conditions of the the contract." Defendant points out that plaintiff has cited no evidence to controvert the board's factual determination that the "overwhelming evidence" showed that any deficiencies in existing ditches within the work area contributed little, if any, to plaintiff's difficulties, and that the real cause of such difficulties was the inability of the off-reservation or outfall ditches to handle the abnormal rainfall adequately after it passed beyond reservation boundaries.

Defendant also contends that it did not guarantee to provide plaintiff with the best of all possible drainage systems nor agree to improve existing ditches. It must not be forgotten that these were gravity ditches in a swamp and as such would necessarily have slow drainage. Although the existing ditches which were under the control of the defendant were to some extent infested with vegetation and the flow of water was necessarily reduced, there is no evidence that water therein was unable to flow or that the flow had been completely obstructed and prevented from reaching the outfall points or would have been inadequate but for abnormal rain. In fact, plaintiff's witness, who had been defendant's acting project engineer, testified that existing ditches did work, but that they could have been improved. There is also evidence that plaintiff's failure to keep the ditches it constructed free of debris, in accordance with contract requirements, contributed to the inefficiency of the drainage.

Plaintiff's complaint then can only be that the ditches did not drain adequately. The plans and drawings did represent that drainage would be effected, but no representation appears, nor should one be implied that drainage would be at a particular rate. Even if the Government represented that drainage would be accomplished at a rapid rate, the court has been shown no way to determine what a rapid rate would be, or that plaintiff was misled by such representation. Obviously, Mr. Banks recognized the importance of the drainage factor in the performance of his work and with this in mind he visited the site prior to bidding in accordance with the site-investigation requirement of the invitation. As has been noted, he was aware of the condition of the ditches. From this knowledge, as well as consideration of the information on the plans that the incline of the ditches was slight, and the nature of the work area, he could anticipate and should have anticipated slow drainage. He also was aware that the plans and specifications did not provide for any clearing or regrading of the existing ditches. In fact, Banks was not, at the time of his visit, by his own ad-

mission, concerned with the rate of drainage.

While the provision for site investigation alone would not relieve the Government of liability for misrepresentation, the plaintiff in this case knew or should have known that the condition of the ditches would not permit a rate of drainage consistent with its hopes or sufficient to take care of abnormal rainfall. The board found that the plaintiff's difficulties were caused by abnormal rainfall. During the period of construction, a total of 52.56 inches of rainfall occurred. Although the record does not show in inches the amount of rain which one can normally expect in the area of Myrtle Beach Air Force Base, it does show, as previously noted herein, that during the performance of this contract 182 days were lost because of rain. Normally 5 days per month, or a total of 75 days, would be anticipated to be lost. A loss of 107 days in excess of what normally can be anticipated was due to the abnormal amount of rainfall, and plaintiff was given a time extension of 107 days though it had requested 97. Not only is the board's finding supported by substantial evidence, but the plaintiff has not contested this finding.

█ Plaintiff also claims that certain work which it had completed was damaged through the fault of members of the Air Force. A ditch was alleged to have been newly cut within the curve formed by Patrol Road, which caused considerable water that had accumulated in this low area to cascade upon plaintiff's completed work. The board denied this portion of the claim for lack of evidence and said: "There were no eyewitnesses to any cutting of the ditch. Nor was there any evidence presented of recent earthworks normally associated with the cutting of a ditch such as vehicular or personnel tracks, dirt piled up on the sides of a ditch by shovels, etc." Plaintiff points out that the Air Base is a restricted military installation and no persons are admitted without identification. This obviously is an attempt to show it is unlikely that other than Air Force personnel could have cut the ditch. The evidence shows, however, that such a ditch had been constructed at least as early as 1955 and was visible to anyone examining the site. The evidence is that plaintiff undercut this ditch and that caused the trouble. There is no evidence to create liability against defendant on this point.

### Fourth Assignment

Plaintiff's fourth assignment is that the board erred in "not holding the Government was liable to plaintiff for extra costs involved in requiring more expensive methods [of construction] to be employed than contemplated in the contract documents." Plaintiff contends that as a result of the alleged failure and refusal of the Government representatives to take prompt remedial action as requested by plaintiff, with respect to regrading certain outfall ditches, its plant and equipment was committed to the execution of the work on a jobsite that was flooded. As a result, its trucks and other equipment became mired in mud and water which caused damage thereto. Some work had to be done over and thus more time and money was required to complete the work.

Plaintiff further contends that it could not reasonably anticipate that it would be required to use other than normal construction methods. Plaintiff states that all contractors are aware of the possibility of rain, and allowances are made for it in the bids. Thus, it continues, plaintiff had a right to assume that the Government would be reasonable in its demands and would cooperate in the execution of the work and not fail and refuse to observe its obligations, or use obstructionary tactics. Defendant points out that plaintiff has not stated what methods were contemplated by the contract and suggests that plaintiff was to use whatever methods were necessary to do the work.

█ As has been previously noted, it is the implied condition of every contract that neither party will do anything to hinder or prevent the other in

the performance of the contract. Bateson-Stolte, Inc. v. United States, 145 Ct.Cl. 387, 172 F.Supp. 454 (1959); Litchfield Mfg. Co. v. United States, supra; Gardner Displays Co. v. United States, supra; Laburnum Constr. Corp. v. United States, 163 Ct.Cl. 339, 350, 325 F.2d 451, 457 (1963). In preparing the design of the work, primary concern was for the finished product, i. e., roads serviced by drainage ditches. Defendant has never considered it necessary to drain the entire military reservation and, of course, had no control over other property. The expense of such drainage would not have had commensurate value to defendant's mission in the area nor have been necessary to provide roads. A ditch serves several purposes, that of collecting water, storing it and directing its flow. The preexisting ditches in this contract were designed to provide for each of those functions and to move the water slowly from the flat area to the outfall. It was not the intent, nor was it contemplated by the contract that water would drain rapidly from the work area. The information contained on the drawings, specifically the elevations and grades of the ditches, as well as the topography of the area, adequately informed Mr. Banks, as he well recognized by virtue of his prebid investigation, that water would not drain at a rapid rate. The preexisting ditches were designed to handle a normal flow and there is no evidence they were ever ineffective for the designed purpose.

Since the contract neither required the defendant to insure rapid drainage nor provide plaintiff with optimum working conditions, an obligation cannot be imposed upon the defendant to provide against every contingency that plaintiff may have encountered. See MacArthur Bros. v. United States, 55 Ct.Cl. 181 (1920), aff'd, 258 U.S. 6, 42 S.Ct. 225, 66 L.Ed. 433 (1922); Christie v. United States, supra. Obviously, had the entire drainage system been regraded to new elevations, the work of the plaintiff would have been facilitated. The fact that this was not done did not render the work impossible, but only more difficult—a difficulty which plaintiff could have and should have anticipated and provided against in its bid.

Plaintiff contends that it was operating under pain of default, while defendant did nothing to alleviate the situation. Defendant, however, was under no duty to alleviate the situation it did not create. Assistance was nevertheless given by several change orders. Plaintiff received time extensions of 262 days, of which 107 were on account of weather and 36 for clearing and grubbing ditches to expedite drainage. For the Government to insist upon compliance with the terms of the contract because of lack of progress not due to any fault of defendant surely is not harassment, as plaintiff appears to contend. The Government has not hindered, harassed or delayed the plaintiff in the performance of its work, which would, if proved, have given rise to liability. Metropolitan Paving Co. v. United States, 325 F.2d 241, 163 Ct.Cl. 420 (1963); United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944).

The contract does not identify what construction practices were to be used so plaintiff was obligated to use any reasonable means necessary to complete the work. Its failure to determine adequately the extent of the work should not be borne by the Government. Rolin v. United States, 160 F.Supp. 264, 268, 142 Ct.Cl. 73, 81 (1958). Plaintiff's increased costs were occasioned through no fault of the Government but solely by the abnormal rainfall and hence must be borne by the plaintiff. Warren-Bros. Roads v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952); Arundel Corp. v. United States, 103 Ct.Cl. 688 (1945), cert. denied, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451; W. F. Maxwell v. United States, 297 F.2d 554, 156 Ct.Cl. 72 (1962). Even if it had been shown that abnormal rainfall was not the basic cause of plaintiff's increased costs, there is no way to apportion these costs between the rainfall and slow drainage of preexisting ditches. If such apportionment

could be made, plaintiff would still fail to recover because the condition of the ditches was evident before bidding and defendant never represented they would carry any more water than they were designed to carry.

### Fifth Assignment

Plaintiff claims in the fifth and final assignment of alleged errors that there was a lack of substantial evidence to support the ASBCA decision. In support of this, plaintiff maintains that it has sustained the burden of proof not only qualitatively but quantitatively, and that indicative of the lack of substantial evidence is the corroboration of significant aspects of plaintiff's case by two of defendant's witnesses.

■■■ It is noted that the plaintiff presented 11 witnesses and the Government 5 in the board hearings. Much of the evidence presented by the plaintiff was cumulative and repetitious. Plaintiff itself has commented in its brief before the ASBCA that each of its points of contention was covered by at least three witnesses, with one possible exception. It is unnecessary to comment upon the quantity of the evidence, for numerical superiority of witnesses alone would not necessarily entitle the plaintiff to relief. The probative value of evidence is not strengthened by cumulative testimony.

■■■ Plaintiff has segregated the areas of corroboration, citing certain testimony of the defendant's witnesses. From this, plaintiff's position, in summary, is that regrading of the outfall at station 80 + 46 of F road was necessary, that the plans and specifications were inadequate as designed, and that plaintiff had no duty to clean out existing ditches. These contentions, plaintiff claims, are corroborated by defendant's engineer, Mr. Romanosky, who was Chief of the Hydraulic Design Branch, Engineering Division, Charleston District. Plaintiff further submits that change order No. 17 was issued 17 months after it was requested by plaintiff, that the clearing and grubbing of the outfall at station

80 + 46 at F road as authorized by telegram of April 18, 1957, was of limited benefit, that the outfall at station 129 + 58.9 of F road was so high that water could not drain from the worksite, that the jobsite was almost entirely flooded at times, and that plaintiff was threatened with default and harassed by letters of complaint. Plaintiff claims that these contentions were corroborated by Lieutenant Colonel Hassell, the defendant's project engineer.

A close examination of Mr. Romanosky's testimony shows it was his opinion that regrading and cleaning of the ditch was unnecessary, and that the ditches were adequate to drain the particular areas involved. Although a major and very expensive change would have been necessary to effect rapid drainage, he considered such a change to be unnecessary for the construction of F road.

With respect to the adequacy of the specifications, Mr. Romanosky acknowledged the well-known principle that if the Government prepares the plans and specifications, it is responsible for their adequacy if the contractor is to build in accordance with them. He pointed out, however, that plaintiff did its work in accordance with the specifications. With respect to the plaintiff's responsibility for clearing existing ditches, Mr. Romanosky agreed that such was not a requirement of the contract. It may be reiterated that it was not a requirement the contract placed on either party.

Attention is next turned to plaintiff's assertions that defendant's project engineer, Lieutenant Colonel Hassell, has corroborated vital parts of plaintiff's claims. First is the contention that change order No. 17 for regrading the outfall to F road was delayed for 17 months. This matter has been considered in connection with plaintiff's second assignment of errors and further reference to it is made here only because plaintiff has reiterated it in slightly different context as an additional assignment of errors.

It is true that change order No. 17 was not issued until August 7, 1958, and

then was done at the request of the United States Air Force. However, earlier clearing and grubbing authorized by the telegram of April 18, 1957, did provide some relief, notwithstanding it was not to plaintiff's satisfaction. It has been found here that defendant had not contracted to provide drainage, other than such as preexisted the contract, either within or beyond the work area, and any assistance it rendered with respect to the outfalls was gratuitous. Even if it had agreed to provide more rapid drainage, its duty would not extend to forestalling every exigency plaintiff might encounter in construction, especially acts of God. It is apparent that due to the abnormal rainfall and resulting accumulation of water, extensive regrading of ditches would have hastened the drainage of the worksite. It has not been proved that, absent such rainfall, regrading would have been necessary to provide adequate drainage for the work area. It is evident that the preexisting ditches did work after the contract was awarded, although without great efficiency. In fact, some testimony by one of plaintiff's own witnesses indicates that plaintiff's failure to keep the ditches it constructed free of debris in accordance with the contract requirements contributed to water remaining in the work area. Plaintiff seems to believe that the fact change order No. 17 was ultimately issued is some kind of an admission against interest which proves its point that such change was necessary to prevent flooding the worksite and that delay in issuing the order was so unreasonable as to constitute breach of contract. The fact is that the work was substantially completed when the change was issued and plaintiff performed the contract notwithstanding the condition of this outfall. The degree of influence an earlier order would have had on plaintiff's work is speculative. Plaintiff's point must fall before the fact that the record does not show how much plaintiff was delayed, if any, by not having had this change order sooner that it did and for

the further reasons that plaintiff has not shown that defendant had any control over this outfall or ever misrepresented its condition which was obvious to plaintiff's president before plaintiff's bid was submitted. Finally, as it has been found that defendant was under no contractual duty to improve off-reservation drainage, or any drainage, recovery is precluded for delay in doing so.

Plaintiff's contention appears to be true that proper drainage of part of the worksite was impeded for a time by one culvert that was too high in a preexisting ditch. However, defendant allowed the grade of the ditch to be reversed and a culvert placed under F road so that water was carried across to the west side. This was done during the period of construction. A change order was issued subsequently and plaintiff was paid for performance of this additional work. Plaintiff has not proved unreasonable delay was occasioned by this matter or that liability has been created against defendant for its voluntary act in trying to help plaintiff in its difficulties.

There was no obligation on the part of defendant to alleviate difficulties due to abnormal rainfall. Insistence by plaintiff that defendant had such an obligation and defendant's refusal to acknowledge it, coupled with defendant's insistence on contract compliance, did not constitute harassment of plaintiff as alleged.

*Summary*

Numerous additional matters were urged by plaintiff before the contracting officer and the boards considering the claim on appeal. These have not been set forth specifically in the assignment of errors urged upon the court and, thus, do not require extensive discussion here. Two of these matters were discussed by the ASBCA in paragraphs III and IV of its written opinion. They pertained to alleged errors in design of roads and ditches and minor damage by Air Force personnel to work performed by plaintiff. The board considered the

latter claim to be supported by the evidence but denied the rest as contrary to the evidence which showed that timely correction of errors was made and that in some instances the trouble was due to plaintiff's failure to utilize proper construction practices.

 It is now just over 5 years since the contracting officer's adverse decision on plaintiff's claim. Plaintiff has aggressively urged its claim upon two successive boards of appeal and now upon the court. An adequate record has been made by the parties for final adjudication. This record has been carefully examined and every decision made thereon has been tested against the criteria of the Wunderlich Act, supra. The administrative decisions are found to be supported by substantial evidence and to be without the taint of gross error implying bad faith, nor are they fraudulent, capricious or arbitrary. Plaintiff has failed to prove entitlement either to equitable adjustment under the contract terms or damages for breach of contract. Plaintiff has received the only relief to which it is entitled, namely, extensions of time and payment for change orders made. Carman v. United States, 166 F. Supp. 759, 143 Ct.Cl. 747 (1958). Plaintiff is the victim of its own indifferent appraisal of jobsite conditions [8] before submission of its bid and of abnormal rainfall. Extra costs flowed therefrom but do not excuse it from performance within the four corners of the contract. Defendant has no obligation to relieve plaintiff of its unexpected financial burdens. Defendant did not misrepresent conditions encountered by plaintiff. Defendant was under no obligation to make such expenditure as necessary to insure plaintiff a trouble-free worksite. Defendant did take some steps to help plaintiff meet unforeseen difficulties but liability does not arise from its failure to take these voluntary steps sooner or more extensively. The record does not support plaintiff's repeated assertions that the preexisting drainage ditches were inoperable. On the contrary, the weight of the evidence shows they did work but simply could not carry unanticipated and abnormal rainfall. Plaintiff has not pointed to any contract requirement defendant has failed to meet. Plaintiff has not shown defendant liable for outfalls beyond the military reservation. Plaintiff has not proved its allegations as to the use of more expensive construction methods. Defendant has met its implied promise under the contract not to hinder plaintiff's performance but there was no implied obligation upon defendant to change the character of the worksite and ditches thereon to accommodate a condition neither party anticipated, thus, making plaintiff's work easier and less costly. Compare Barnard-Curtiss Co. v. United States, 301 F.2d 909, 912, 157 Ct.Cl. 103, 109–110 (1962); Rolin v. United States, supra; Arundel Corp. v. United States, supra; MacArthur Bros. Co. v. United States, supra; Maxwell v. United States, supra; Restatement, Contracts § 467 (1932).

## CONCLUSION OF LAW

Upon the foregoing opinion which includes therein the findings of fact and which is adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. The petition is therefore dismissed.

---

8. Plaintiff's bid was some $40,000 below the Government estimate and some $25,-000 below the next lowest bidder. The highest of the 12 bids was approximately $150,000 higher than plaintiff's bid.