**WEAVER–BAILEY CONTRACTORS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 137–87C.

United States Claims Court.

Feb. 9, 1990.

Charles Darwin Davidson, with whom was Clark W. Mason, Little Rock, Ark., for plaintiff.

Paul D. Langer, with whom were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, and Thomas W. Peterson, Asst. Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case is a direct-access appeal from the contracting officer's denial of plaintiff's request for an equitable adjustment, and comes before the court for disposition following a four day trial. The central issue presented is whether the delay in completing the contract was caused in whole or in part by plaintiff, thus precluding recovery, or whether the government was the sole cause of the delay, in which case plaintiff is entitled to compensation. For the reasons set forth below, judgment is for plaintiff.

## FACTS

Plaintiff Weaver–Bailey Contractors, Inc. was awarded contract no. DACW–56–84–C–0102 by the United States Army Corps of Engineers (the Corps) on July 5, 1984, for a firm fixed price of $1,434,023.94. The contract called for Weaver–Bailey to build beaches, breakwaters, parking areas, boat ramps, and other items relating to the improvement of the recreation areas surrounding Arcadia Lake in Edmond, Oklahoma. Most of the work required was earthwork, specifically, cutting slopes in some areas and filling other areas, followed by grading and finishing. Areas which did not immediately border on the lake were to be finished by seeding and sprigging.[1] Breakwater areas were to be created by placing material known as riprap—loose rock of specified size—on the finished slopes bordering the lake.

Weaver–Bailey began work on the project on August 8, 1984, and work progressed smoothly through the late summer and early fall. The contract specifications, which were prepared by the Corps, estimated the amount of unclassified excavation[2] at 132,000 cubic yards (cy). However, in early October, 1984, it became evident that the Corps had substantially underestimated the amount of unclassified excavation; it was later determined that the Corps' estimate was off by 41%. Thus, as winter was approaching, plaintiff suddenly learned that the total amount of unclassified excavation it was required to perform was not 132,000 cy, but rather 186,695 cy. A modification was issued, and plaintiff was paid approximately $180,000, or $3.29 per cy, for the additional 54,695 cy of unclassified excavation. Plaintiff had originally bid the unclassified excavation portion of the project at $3.42 per cy.

Plaintiff's planned work schedule was disrupted by the revelation that the earthwork portion of the project had increased dramatically. Plaintiff was forced to concentrate its efforts on completing the earthwork, instead of grading and finishing the slopes and placing rip-rap. Rick Stephenson, plaintiff's project superintendent, gave uncontroverted testimony emphasizing that Weaver–Bailey could have com-

---

1. "Sprigging" is landscaping consisting of grass or other groundcover.

2. "Unclassified excavation" refers to earth of unknown composition. Whether the material to be moved is sand, loam, clay, or rock, the contractor agrees to move unclassified excavation at a given price per cubic yard.

pleted the finishing operations in about a month, had the extra earthwork not been required. Once the winter weather set in, it was too late to do the final grading and finishing of slopes, because the changes in soil density and moisture content over the winter would have changed whatever contours plaintiff put on the slopes.

The winter weather also delayed placement of rip-rap. Defendant's own witnesses, Carl Sparks, J.D. Stahlman, and Dennis Frazier, all testified that it would be unwise, if not contrary to the contract specifications, to place rip-rap on wet or frozen ground. As a result, several areas remained unfinished and unprotected from erosion through the winter months. Weaver–Bailey kept its men and equipment on the job site throughout the winter, but was unable to accomplish much due to the severity of the winter weather. The government refused to allow Weaver–Bailey to demobilize and return to the job site in the spring.

Once spring came, plaintiff was forced to repair many slopes which were damaged by erosion during the winter. Some of the slopes had developed gullies large enough for a man to stand in. The project was finally completed on April 23, 1985. The original contract had called for completion by February 13, 1985, but the government had extended the time for performance by 68 days under paragraph 63 of the contract. Paragraph 63 excuses the contractor from paying liquidated damages for late completion, where time is lost due to inclement weather conditions. However, based upon the testimonial and documentary evidence presented at trial, it is clear that Weaver–Bailey would have completed the project by December 3, 1984. Thus, the government's underestimate actually delayed Weaver–Bailey's completion by 138 days.

## DISCUSSION

### I. Excusable and compensable delay.

The leading treatise on government procurement law sets forth a concise explanation of the risk allocation scheme contained in the standard contract clauses relating to delays in contract performance:

> [T]ime and cost effect of delays are dealt with separately.... The contractor bears the risk of both time and cost for delays which he causes or which are within his control. Generally he is excused from non-performance because of delays caused by factors for which neither he nor the Government is responsible. The Government is responsible for both the time and cost effect of delays which it causes, which are under its control, or for which it has agreed to compensate the contractor.

J. Cibinic & R. Nash, *Administration of Government Contracts* 409 (2d ed. 1986).

■ Thus, not all delays are excusable, and furthermore, not all excusable delays are compensable. Only if the delay was caused *solely* by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay. *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir. 1984); *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 700 (1984). In order for Weaver–Bailey to recover excess costs for delay in completing contract performance, it must show that the delay resulted solely from the government's underestimate of the amount of unclassified excavation, and that there were no concurrent delays not caused by the government.

■ Weaver–Bailey's delay in completing performance was excusable under paragraph 63 of the contract, which provides in part:

> *Default (Fixed–Price Construction) (1984 Apr) FAR 52.249–10*
>
> (b) The Contractor's right to proceed shall not be terminated nor the contractor charged with damages under this clause, if—
>
> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractu-

al capacity, (iii) acts of another Contractor in the performance of a contract with the Government, (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers.

\* \* \* \* \* \*

The government's underestimate of the amount of unclassified excavation, which pushed Weaver–Bailey into the winter weather, was clearly unforeseeable and beyond the control of Weaver–Bailey. However, the default clause above does not address the compensation element of the delay, and the court must look elsewhere for a basis for Weaver–Bailey's recovery of excess costs caused by the delay.

Paragraph 43 of the contract provides in part:

*Differing Site Conditions (1984 Apr) FAR 52.236–2*

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

\* \* \* \* \* \*

From the evidence presented at trial, Weaver–Bailey has shown that it is entitled to an equitable adjustment under subsection (a)(1) of the Differing Site Conditions clause.[3] The government argues that Weaver–Bailey has already been compensated for its claim. However, the $180,000 modification for moving the extra 54,695 cy of unclassified excavation merely compensated plaintiff for moving the dirt itself, at a unit-price comparable to the unit-price for the rest of the unclassified excavation. The $180,000 modification in no way took into account the cost effect of the delay resulting from the extra earthwork; indeed, the modification was entered into long before any assessment could be made of the cost effect of the delay.

Weaver–Bailey asserts that paragraph 56 of the contract, "Changes," provides an alternative theory of recovery of its increased costs connected to the increase in unclassified excavation. Paragraph 56 provides that "[i]f any change under this clause causes an increase or decrease in the

---

**3.** Paragraph 7 of the contract provides:
*Variation in Estimated Quantity (1984 Apr) FAR 52.212–11.*
If the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity. If the quantity variation is such as to cause an increase in the time necessary for completion, the Contractor may request, in writing, an extension of time.

This clause requires the contractor to perform all unit-priced work at the unit-price originally bid, with repricing to occur only if the quantity of unit-priced work varies by more than 15% from the original estimated quantity. *See, e.g., N. Fiorito Co. v. United States,* 416 F.2d 1284, 189 Ct.Cl. 215 (1969). The clause does not seem to be intended to address a contractor's increased costs resulting from delays connected to unexpected increases in quantities of unit-priced work. Without deciding whether the Variation in Estimated Quantity clause applies to the present case, the court simply notes that the Differing Site Condition clause clearly provides a sufficient basis for granting Weaver–Bailey the relief it seeks.

Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such [change] order, the Contracting Officer shall make an equitable adjustment...." The record does not reflect whether the $180,000 modification to the contract was made under authority of the Changes clause, so the court cannot say whether the Changes clause, by its terms, applies.

Further complicating an analysis of Weaver–Bailey's claim under the Changes clause is the question of whether the magnitude of the increase in unclassified excavation was "beyond the scope" of the original contract, rendering the Changes clause inapplicable. *See, e.g., P.J. Saddler v. United States*, 287 F.2d 411, 152 Ct.Cl. 557 (1961) (near doubling of the amount of excavation required under contract to build a levee embankment was beyond the scope of the original contract and thus, Changes clause inapplicable). Without deciding whether the Changes clause provides a basis for recovery by Weaver–Bailey, the court again notes that the Differing Site Conditions clause clearly does provide such a basis.

The government argues that this is not a delay case. The argument is as follows: (i) Weaver–Bailey projected that it would use the entire time allowed under the contract, *i.e.*, until February 13, 1985, to complete performance; (ii) the time for performance was extended due to inclement weather; (iii) Weaver–Bailey completed the required work within the extended time period. Therefore, from the government's standpoint, the contract was completed on time. This argument fails because *from Weaver–Bailey's standpoint*, contract performance was delayed due to the Corps' underestimate of unclassified excavation, which caused Weaver–Bailey to incur extra costs. At trial, the government presented Weaver–Bailey's proposed construction progress charts, submitted at the inception of the contract, in which Weaver–Bailey projected that it would use the entire time allotted. Notwithstanding these projections, the government is not relieved from liability, for two reasons.

First, plaintiff presented the testimony of Marion Stephenson, demonstrating that Weaver–Bailey intended to complete the project before the onset of the Oklahoma winter. Mr. Stephenson served as project manager for Weaver–Bailey on the Arcadia Lake project, and has 45 years of experience in earthwork. He has successfully completed numerous large state and federal construction contracts throughout the midwest, and not once has Mr. Stephenson been penalized for late performance on a job. The court found Mr. Stephenson's testimony to be lucid and credible.[4]

Mr. Stephenson explained that no rational contractor would plan to do earthwork through an Oklahoma winter. Excavation operations become difficult, if not impossible, once the winter rain and snow set in; the earth becomes too heavy or is frozen, and for all intents and purposes, is unworkable. Furthermore, the often bitter windchill in Oklahoma in January and February, sometimes as low as 20 degrees below zero, can make outside work dangerous. The court cannot accept the government's contention that an experienced earthwork con-

4. Defendant attacked Mr. Stephenson's credibility by introducing evidence that Mr. Stephenson settled a lawsuit against Weaver–Bailey arising out of their relationship as co-venturers on the Arcadia Lake contract, in exchange for a share in any judgment that might be recovered in the present suit. Weaver–Bailey and Mr. Stephenson had bid the Arcadia Lake project together, with Mr. Stephenson and Weaver–Bailey agreeing to split any profits and share any losses. Mr. Stephenson sued Weaver–Bailey, believing that it was the only way to protect his interest in the Arcadia Lake venture, since he was not a party to the contract with the government. Defendant wished to create the impression that Mr. Stephenson's testimony was unreliable, in light of his financial interest in the outcome of this litigation. The court merely notes that Mr. Stephenson's testimony is no less reliable than that of most friendly witnesses called by a contractor seeking an equitable adjustment. Mr. Stephenson does stand to gain from a ruling in favor of Weaver–Bailey, but virtually every head or senior employee of a plaintiff in a suit in this court stands to gain from a favorable decision. While this is a factor to be weighed, it does not in and of itself destroy reliability.

tractor like Mr. Stephenson intended to work through the winter months.

As to why Weaver–Bailey submitted proposed construction progress charts utilizing all of the time allotted in the contract, Mr. Stephenson explained that there is no incentive for a contractor to submit projections reflecting an early completion date. The government bases its progress payments on the amount of work completed each month, relative to the contractor's proposed progress charts. A contractor which submits proposed progress charts using all of the time in the contract, and which demonstrates that work is moving along ahead of schedule, will receive full and timely progress payments. If such a contractor falls behind its *true* intended schedule, *i.e.*, its accelerated schedule, it will still receive full and timely progress payments, so long as it does not fall behind the progress schedule which it submitted to the government.

On the other hand, if a contractor which intended to finish early reflected such an intention in its proposed progress charts, it would have to meet that accelerated schedule in order to receive full and timely progress payments; any slowdown might deprive the contractor of such payments, even if the contractor is performing efficiently enough to finish within the time allotted in the contract. In short, a contractor cannot lose when it projects that it will use all of the time allowed, but it can be hurt by projecting early completion. Additionally, Mr. Stephenson and others testified that they were told by government representatives to fill out the proposed progress charts using all of the allotted time. The government did not challenge this testimony, either on cross-examination or on direct examination of a government witness.

Second, "[w]hile it is true that there is not an 'obligation' or a 'duty' of defendant to aid a contractor to complete prior to [the] completion date [called for in the contract], from this it does not follow that defendant may hinder and prevent a contractor's early completion without liability. It would seem to make little difference whether or not the parties contemplated an early completion, or even whether or not the contractor contemplated an early completion." *Metropolitan Paving Co. v. United States*, 325 F.2d 241, 163 Ct.Cl. 420, 423 (1963). Thus, even if Weaver–Bailey failed to rebut the government's evidence relating to its intended completion date, the government's point carries little weight. The proper focus is not whether Weaver–Bailey informed the government, at the inception of the contract, that it *intended* to complete the project before winter; rather, the focus should be on whether Weaver–Bailey *would have* completed the project early, but for the government-caused delay.

As discussed above, there is ample support for finding that plaintiff would have completed the project by late November, prior to the onset of winter weather, had the specifications been accurate. The evidence at trial indicates that plaintiff moved the original quantity of unclassified excavation, 132,000 cy, by the end of October. Had the specifications been accurate, only finishing work would have remained for November. However, because of the Corps' underestimate, plaintiff was forced to delay finishing work while it concentrated on completing the extra earthwork.

## II. Critical path analysis.

At trial, the government presented the testimony of David Berkey, a claims analyst with the United States Army Corps of Engineers, Tulsa, Oklahoma District. Mr. Berkey testified as to his analysis of Weaver–Bailey's claim. Mr. Berkey had nothing to do with the Weaver–Bailey contract until after the contract had been completed. Mr. Berkey has no experience in earthwork, nor as an engineer. In essence, Mr. Berkey testified as an expert, giving his view of the validity of plaintiff's claim, based solely on documents obtained from the Corps and from plaintiff, and his training in claims analysis.

Defendant introduced into evidence several worksheets prepared by Mr. Berkey, purporting to show the start and finish dates of various tasks on the project. The evidentiary value of these exhibits is dubi-

ous, considering that they were prepared by someone with no personal knowledge of the project, and were summaries of other documents not in evidence. Plaintiff cast serious doubt on the conclusions reached by Mr. Berkey, by pointing out that Mr. Berkey had misinterpreted much of the data upon which he relied. Defendant's exhibit 1B, to take one example, was a chart setting out plaintiff's payroll data. The chart listed the operators of different types of equipment, and their corresponding wage rates. For example, an end-dump operator might receive a different wage than a scraper operator. Mr. Berkey concluded that if an end-dump operator had been paid, say, for 40 hours in a given week, then an end-dump must have been in use for 40 hours that week. Mr. Berkey then drew conclusions about how much and what type of work had been done that week, based upon the amount of time he thought certain equipment, say, an end-dump, was or was not in use.

Mr. Berkey's conclusions regarding the amount of time a given piece of equipment was in use were faulty. This is because Weaver–Bailey paid a worker for the highest grade, or wage, for which he was qualified, even when that worker performed work in a lower grade. The only conclusion that can be drawn from a payroll entry reflecting 40 hours worked one week by an end-dump operator, is that for that week, someone qualified to operate an end-dump was on the site, doing some type of work. Exactly what work was performed cannot be ascertained solely from the payroll records.

Another example of the problems with defendant's evidence is defendant's exhibit 3, which was Mr. Berkey's summary of the amount of unclassified excavation moved at various times in the project. Although defendant did not introduce its exhibit 3 into evidence, other exhibits which were introduced by defendant relied on the data contained in exhibit 3. Yet Mr. Berkey admitted that he never attempted to verify independently the figures in exhibit 3, and the figures in exhibit 3 seemed to be based on mere estimates by Weaver–Bailey.

The court now turns to perhaps the centerpiece of the government's case: Mr. Berkey's critical path analysis of the Weaver–Bailey contract. Mr. Berkey's succinct definition of critical path activities are "those activities which if allowed to grow will impact the completion date of the project." The critical path method of ordering tasks was explained more fully by the Court of Claims in *Haney v. United States*, 676 F.2d 584, 230 Ct.Cl. 148, 167–68 (1982):

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

Mr. Berkey used a computer to perform two critical path analyses of the Weaver–Bailey contract. One is called "planned schedule," the other, "actual durations/sequences." The court heard foundational testimony on the power of Mr. Berkey's computer and the program he used in performing his critical path analyses. While the court appreciates the value of computers in making complex tasks simpler, it must be remembered that a computer-generated analysis is no better than the data which is entered into the computer.

The "planned schedule" critical path runs through all of the unclassified excavation and most of the rip-rap placement, and

contains fourteen activities. By contrast, the "actual durations/sequences" critical path runs through only four activities, and most of the activities identified as critical in the "planned schedule" contain float time in the "actual durations/sequences" chart. From exhibit 30, "actual durations/sequences," defendant asks the court to draw the conclusion that since most of the activities involving unclassified excavation were not on what Mr. Berkey has determined to be the critical path of the project, the 41% increase in unclassified excavation did not delay Weaver–Bailey's completion of the project.

As the discussion above indicates, the court has serious doubts as to the validity of the data Mr. Berkey used to create exhibit 30. Many of Mr. Berkey's assumptions are based upon rehashings and interpretations of a collection of documents not even in evidence; indeed, plaintiff demonstrated persuasively that at least some of Mr. Berkey's data were either unverified or simply wrong. The court feels that any reliance on defendant's exhibit 30, as accurately reflecting the time and cost effect of the increase in unclassified excavation, would be misplaced. Moreover, the conclusions Mr. Berkey draws from his critical path analyses reflect a misunderstanding of the concept of float time.

To reiterate, a critical path activity is one which, if allowed to grow in duration *at all*, will cause the overall time required to complete the project to increase. By contrast, an activity with float time may grow in duration *up to a certain point*, without an adverse impact on the time required to complete the project. Consider the example of a contractor who committed himself to building a house, beginning on January 1, 1989. The contractor has determined that he will need one year to complete the job. Pouring the foundation is a critical path activity because any increase in the amount of time required to complete the foundation will cause an increase in the amount of time needed to complete the house; work on the walls, floors, roof, and utilities cannot begin until the foundation is complete.

Suppose that as part of the job, the contractor promised to build a fence along two edges of the property, and that building the fence will take 20 days. No other work depends on the completion of the fence, so delaying work on the fence until December 11, 1989 will not put the contractor in danger of late completion. In other words, building the fence is an activity with a lot of float time. However, float time is never unlimited. If on December 20 the contractor has yet to begin the fence, or if there is more than 11 days' worth of fencing work to be done as of December 20, then the contractor will not finish the job on time. From the foregoing, one can make the following generalization: regardless of whether an activity is on the critical path of a project, if the time required to complete the activity is greater than the time remaining to complete the project, then project completion will be delayed.

Consider now the effect on our hypothetical contractor if on December 1, before fencing work had begun, the buyer of the house told the contractor that he would like all four sides of the property to be fenced, thereby doubling the fencing work. Clearly the contractor could not complete the entire project by the end of the year, but through no fault of his own. The time required for the fencing portion of the job is now 40 days, and the contractor has only 31 days left. Weaver–Bailey was in much the same position as our hypothetical contractor when it discovered in October that the unclassified excavation portion of the project had increased. It was progressing toward a late November or early December completion, until the work was increased by 41%.

Mr. Berkey's critical path analyses merely distract from defendant's real argument concerning the effect of the 41% underestimate of unclassified excavation. At trial, J.D. Stahlman testified that rip-rap placement can and should follow closely behind unclassified excavation, in a technique known as phased construction. If this technique is used, the slope is protected from deterioration almost as soon as it is cut. Defendant seems to be arguing that Weaver–Bailey should have spent more

**482**

time in the fall protecting the already-excavated areas from erosion, and less time trying to complete the unclassified excavation.

The court does not see how Weaver–Bailey can be faulted for the way it handled the unclassified excavation. The government does not even allege that plaintiff would not have completed the project by early December, in the absence of the 41% increase in unclassified excavation. Furthermore, the government does not allege that the contract required Weaver–Bailey to use the phased construction technique.[5] The reason Weaver–Bailey did not utilize the phased construction technique from the outset of the contract is because it did not have to. It was not until early October that plaintiff had any indication that the earthwork portion of the project would be increased, and Mr. Stephenson, an experienced and successful earthwork contractor, had no reason to anticipate through the late summer and early fall that the slopes would need protection from the effects of winter weather. Once the Corps' underestimate was revealed, Weaver–Bailey acted reasonably under the newly-imposed time constraints. Weaver–Bailey does not have unlimited resources, and it concentrated its manpower in the areas which it thought needed the earliest attention.

The government contends that any delay in laying rip-rap is attributable to difficulties encountered by Weaver–Bailey's rip-rap subcontractor. If the evidence supported this contention, then Weaver–Bailey's extra costs for repairing eroded areas requiring rip-rap would not be compensable, as it could not be said that the government was the sole cause of the delay. However, the court is not convinced that the rip-rap subcontractor can be faulted.[6] As Mr. Stephenson explained, the contract required 12-inch rip-rap in some areas, and 15-inch rip-rap in other areas. Generally, rip-rap is available in either 12-inch or 18-inch sizes; 15-inch rip-rap is hard to obtain. Eventually, the Corps recognized its error, and agreed to accept rip-rap of a size that was commercially available. Additionally, any apparent delay on the part of the rip-rap subcontractor had no effect on Weaver–Bailey's intended early completion date. The excavation had to be completed prior to laying the rip-rap, and as explained earlier, once the cold, wet weather set in, rip-rap could not be laid.

### III. Admissibility of deposition testimony.

At trial, plaintiff read into the record excerpts from the depositions of Mr. Troy Gladden and Mr. Dennis McCants, over defendant's strenuous objections. Defendant based its objection on two grounds: (i) the deposition testimony is inadmissible hearsay; and (ii) plaintiff failed to comply with RUSCC 32, which governs the use of depositions in court proceedings. The two grounds are intertwined, and a proper analysis begins with RUSCC 32(a), which provides:

> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions, in addition to Appendix G ¶ 16 governing the use of depositions as substantive evidence.

Defendant does not dispute that the government was represented at the depositions of Messrs. Gladden and McCants. Rather, defendant claims that plaintiff failed to comply with RUSCC Appendix G, ¶ 16, and furthermore, the deposition testimony would be inadmissible hearsay if the witnesses had been present and testifying at trial. RUSCC Appendix G, ¶ 16, pro-

---

**5.** For a further discussion of plaintiff's evidence relating to the use of the phased construction technique, see the discussion of the deposition testimony of Mr. Troy Gladden at section III below.

**6.** For a further discussion of plaintiff's evidence relating to whether the rip-rap subcontractor was at fault, see the discussion of the deposition testimony of Mr. Troy Gladden at section III below.

vides that "[a]ny party intending to present substantive evidence by way of deposition testimony, *other than as provided by Fed. R.Evid. 801(d)*, shall serve and file ... a separate motion for leave to file the transcript of this testimony with the Clerk of the Court...." (Emphasis supplied.) However, the deposition testimony at issue here is admissible under Fed.R.Evid. 801(d), so whether plaintiff filed a motion for leave to file the deposition transcript is irrelevant.[7]

Thus, the deposition testimony of Messrs. Gladden and McCants was properly admitted, so long as it falls under one of the subdivisions of RUSCC 32(a). Subsection (2) of RUSCC 32(a) provides that:

> The deposition of a party or anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership, or association, or governmental agency which is a party may be used by an adverse party for any purpose.

Messrs. Gladden and McCants gave depositions on behalf of the government under rule 30(b)(6), so subsection (2) provides the requisite basis for admitting the deposition testimony. Defendant argues that plaintiff is required to make a showing that the deponents were unavailable to testify at trial, before offering their depositions as substantive evidence. However, as the Fifth Circuit explained in construing Fed.R. Civ.P. 32(a)(2), which is substantially similar to RUSCC 32(a)(2), "the Rule permits a party to introduce the deposition of an adversary as part of his substantive proof regardless of the adversary's availability to testify at trial." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 308 (5th Cir.1978) (citations omitted). Therefore, the deposition testimony was properly admitted.

The portions of Mr. McCants' deposition which were admitted related to whether Weaver–Bailey was required to submit proposed construction progress charts using all of the time allowed under the contract. Mr. McCants expressed the opinion that the contractor was required to show, on the charts it submitted, that all of the time would be used. In light of the court's findings as to Weaver–Bailey's intention and ability to complete the job early, *see* p. 479 *ante*, Mr. McCants' remarks concerning the proposed construction progress charts were not necessary for plaintiff to carry its burden of proof.

Mr. Gladden's deposition testimony related to the laying of the rip-rap. First, he expressed the opinion that the rip-rap subcontractor was not at fault, and did not unduly delay the laying of the rip-rap. Mr. Gladden's testimony also ran counter to that of Mr. Stahlman, *see* pp. 481–82 *ante*, on the issue of whether the phased construction technique should have been used. Mr. Gladden suggested that rip-rap placement should not begin on a slope until that slope has been cut and graded in its entirety. Mr. Gladden's deposition testimony buttresses the court's conclusion that neither Weaver–Bailey nor its subcontractor can be faulted for delaying completion of the project. It should be noted, however, that the testimony of Mr. McCants and Mr. Gladden was not necessary for plaintiff to prevail.

### IV. Damages.

Plaintiff presented evidence of damages resulting from the increased earthwork totaling $469,041.00, broken down as follows: (i) changes at Spring Creek Road F, $8731; (ii) standby equipment charges, $199,450; (iii) extended field office overhead, $151,-110; (iv) extended home office overhead, $65,412; (v) profit, $42,470; and (vi) bond, $1868. Defendant did not seriously attempt to controvert plaintiff's assessment of its damages at trial. However, in its post-trial brief, defendant asserts that if the government is liable, plaintiff's calcula-

---

7. Fed.R.Evid. 801(d)(2) provides that a statement is not hearsay if "[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity...." Mr. McCants was the resident engineer with the Tulsa District of the Army Corps of Engineers. Mr. Gladden was an inspector on the Arcadia Lake project. Thus, both men testified at deposition on behalf of the government, *i.e.*, in a representative capacity, and the statements were offered against the government.

tion of extra costs related to standby equipment charges is too high, and furthermore, plaintiff is not entitled to profit on its claim for an equitable adjustment.

With respect to the standby equipment charges of $199,450, defendant argues that the equipment expenses should be calculated at ownership rates, rather than rental rates. On cross-examination, Jack Blaiss testified that the cost of operating contractor-owned equipment is generally less than the cost of renting the same equipment. Under FAR 31.205–36(b), a government contractor's charge for rental equipment is subject to a reasonableness test, in light of the market for similar rental equipment in the area. Furthermore, where the contractor and the lessor of the equipment are under common control, rental rates cannot exceed the normal costs of ownership, unless the lessor has "an established practice of leasing the same or similar property to unaffiliated lessees."

Defendant points out that Weaver–Bailey leased equipment from M.R.S. Enterprises, a firm controlled by Marion Stephenson, and raises the issue of whether, in light of Marion Stephenson's relationship with Weaver–Bailey, M.R.S. Enterprises and Weaver–Bailey should be treated as being under common control for purposes of FAR 31.205–36(b). However, defendant has done no more than raise the issue. Defendant introduced no evidence relating to whether or not M.R.S. Enterprises has "an established practice of leasing the same or similar property to unaffiliated lessees," nor did defendant introduce any evidence relating to the reasonableness of the rates charged. In short, the court sees no reason why it should disallow Weaver–Bailey's claimed costs for rental equipment, when plaintiff has produced competent, unrebutted evidence of those costs.

█ Defendant's blanket assertion that a contractor is not entitled to profit on its claim for an equitable adjustment is incorrect. While profit is specifically excluded from adjustments under certain clauses, e.g., the Suspension of Work clause, FAR 52.212–12, recovery of profit on work added to the original contract requirements is allowed. *See, e.g., Kunz Construction Co. v. United States,* 12 Cl.Ct. 74, 82 (1987). Plaintiff's request for $42,470 in profit on its claim for an equitable adjustment is based upon a 10% profit rate, that is, 10% of the total of items (i) through (iv). This court has allowed a profit of 15% as reasonable, in a contractor's claim for an equitable adjustment based on a differing site condition. *See Shank–Artukovich v. United States,* 13 Cl.Ct. 346, 360 (1987), *aff'd.,* 848 F.2d 1245 (Fed.Cir.1988). Thus, Weaver–Bailey is entitled to recover a 10% profit on its claim.

## CONCLUSION

Plaintiff has met its burden of proving its entitlement to an equitable adjustment in the amount of $469,041.00, with interest under the Contract Disputes Act, 41 U.S.C. § 611, running from January 18, 1986, the date the claim was filed with the contracting officer. The clerk is directed to enter judgment accordingly.